156 N.J. Super. 231 (1977)
383 A.2d 760
IN THE MATTER OF THE HOSPITALIZATION OF B.
Superior Court of New Jersey, Law Division.
Decided December 22, 1977.
*232 Mr. Donald T. Smith, Union County Legal Services Corporation, for patient.
Mr. William F. Hyland, Attorney General, for Department of Human Services (Mr. Steven Wallach, Deputy Attorney General, appearing).
Mr. Anthony Russo, Union County Adjuster, for County of Union.
CALLAHAN, J.D.C., Temporarily Assigned.
The issue presented is whether this court shall order forced medication to an involuntarily committed patient.
B., a young adult, was arrested for atrocious assault and battery upon his three-year-old nephew, S.B. had been baby-sitting the child, who cried uncontrollably, concluded that the child had a devil, and struck him. While awaiting hearing on the charge in the county jail B. attempted suicide *233 and was involuntarily transferred to Trenton Psychiatric Hospital on January 14, 1977.
Subsequent civil commitment reviews found him to be a danger to himself and a continued course of treatment necessary for the patient. B. has remained in Trenton Psychiatric Hospital until the present time.
At a subsequent hearing on B.'s commitment, the treating physician sought the court's permission to administer a psychotropic drug. The trial judge, while ordering B.'s continued institutionalization, scheduled a separate hearing on the question of forced medication and invited a court-appointed psychiatrist to review the treatment program, interview the patient and report to the court on the medication issue.
The treating physician testified that the use of psychotropic drugs was required because B. had not responded to all conventional therapies. Psychotropics is the name given to a group of drugs utilized by professionals to reduce a patient's psychotic symptoms and allow the hospitalized patient's return to and maintenance in the community. The doctor's drug of choice was Prolixin because of its benefits, and since it is administered by injection only once every two weeks, it avoids a need for the patient to be disturbed more often. He indicated that the hospital had repeatedly sought B.'s voluntary cooperation in using such medication without success.
B.'s reluctance derives from his own experiences with Haldol, another psychotropic drug, and his observations of Trenton Hospital inmates who take Prolixin. When B. earlier received Haldol, he said he slept up to 20 hours a day. The medical literature describes excessive drowsiness as a relatively common side effect of Haldol and other psychotropic drugs. B. also testified that many patients who receive Prolixin at Trenton Hospital display disturbing side effects. Prolixin and Haldol are two of a group of major tranquilizers affecting the central nervous system which are used in the treatment of schizophrenia. In a significant percentage of *234 patients, psychotropic drugs are known to produce effects similar to the symptoms of Parkinson's Disease, such as loss of muscular control, involuntary grimaces and twitching, among other symptomatology. While such symptoms are temporary in most cases and are controlled by anti-Parkinsonian drugs, the effects are sometimes permanent and known as tardive dyskinesia, a neurologic disorder. American College of Neuropsychopharmacology  FDA Task Force, "Neurologic Syndromes Associated with Anti-Psychotic Drug Use", 289 N. Eng. J. Med. 20 (1973). B.'s reservations are fully shared by some commentators. See, e.g., Zander, "Prolixin Decanoate: A Review of the Research," 2 Mental Disability L.R. 37 (1977); DuBose, "Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment?," 60 Minn. L. Rev. 1149 (1976); Gardos et al., "Maintenance Antipsychotic Therapy: Is the Cure Worse than the Disease?" 133 Am. J. Psychiatry 32 (1976); Note, "Conditioning and Other Technologies Used to `Treat?' `Rehabilitate?' `Demolish?' Prisoners and Mental Patients," 45 S. Cal. L. Rev. 616 (1972).
The court finds the patient's refusal to take Prolixin is not, however, based entirely on rational considerations, but reflects delusional thinking. B.'s condition has been diagnosed as paranoid schizophrenia. He apparently hears voices, which he believes to be God's and which he obeys. On one occasion those voices directed him to assault another inmate. The inmate was evidently not harmed, and he and B. are now said to be friends. According to Dr. Sadoff, the court-appointed expert with excellent qualification, B. feels he must remain alert and strong in order to ward off evil forces. Dr. Sadoff recommended the voluntary ingestion of a psychotropic, Mellaril, to be forced upon B. only as a final alternative.
At a subsequent hearing on November 11, 1977, B. was found by another county court judge to be competent to stand criminal trial on the original atrocious assault and battery *235 charge, but not guilty of that offense by reason of insanity at the time it was committed.
In Price v. Sheppard, 239 N.W.2d 905, 911 (1976), the Minnesota Supreme Court held that an involuntarily committed mental patient may not withhold his consent to "customary" forms of treatment, stating: "If that interest of the state is sufficiently important to deprive an individual of his physical liberty, it would seem to follow that it would be sufficiently important for the state to assume the treatment decision. We hold that it is." The court went on to state, however, that federal constitutional law requires the informed consent of the patient or his guardian to "more intrusive forms of treatment." The court did not consider, however, whether administration of psychotropic medication is an intrusive form of treatment, and the Minnesota trial courts have divided over the question.
In In re Cleo Lundquist, No. 140151 (April 30, 1976), the Ramsey County, Minnesota Probate Court made these findings of fact:
1. That the use of Prolixin decanoate is an intrusive form of psychiatric treatment which requires the consent of the patient, or the consent of the patient's guardian, or an Order of the Court authorizing the treatment.
2. That the use of Prolixin decanoate may produce significant adverse side effects depending on the reaction of the patient to the drug and the amount of the drug injected into the patient's body. That the risk of adverse side effects is substantial when high dosages are used. When low dosages of 25 milligrams or less are used at intervals of not less than two weeks, the side effects are much less and can usually be controlled by other medication.
3. That Prolixin decanoate is not considered an experimental drug and has been approved by the Federal Drug Administration. However, its long-term effects at this time are unknown. That the use of the drug is a substantial intrusion into the patient's body although little pain is connected with treatment. That effects of the drug once injected into the body may produce changes in the patient's mental process lasting from four to eight weeks. That once injected into the body there is no known drug that can be used to counteract the effects of Prolixin decanoate.
*236 In In re Paul Fussa, No. 46912 (June 14, 1976), however, the Hennepin County, Minnesota Probate Court held the use of Prolixin to be a commonly employed medical practice. It held that requiring court hearings before forcible administration would "impinge on hospital staff discretion and needlessly delay or frustrate treatment."
B. has not been adjudicated pursuant to R. 4:83 and N.J.S.A. 3A:6-35 et seq., incompetent to manage his own affairs, and no guardian has been appointed. He had withheld his consent to the proposed medication, and no other person is authorized to give consent on his behalf.
It is, of course, possible to argue that the Legislature has already determined that only "experimental research, shock treatment, psychosurgery or sterilization" are intrusive forms of treatment, N.J.S.A. 30:4-24.2(d)(2), while administration of medication is customary. N.J.S.A. 30:4-24.2(d)(1). The prior informed consent of the patient or his guardian is required by N.J.S.A. 30:4-24.2(d)(2). Significantly, N.J.S.A. 30:4-24.2(d)(1) contains no such requirement. It requires only that:
No medication shall be administered unless at the written order of a physician. Notation of each patient's medication shall be kept in his treatment records. At least weekly, the attending physician shall review the drug regimen of each patient under his care. All physician's orders or prescriptions shall be written with a termination date, which shall not exceed 30 days. Medication shall not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with the patient's treatment program. Voluntarily committed patients shall have the right to refuse medication.
Involuntarily committed patients, such as B., do not have the right to refuse medication. See generally, Brooks, "The Right to Refuse Treatment," 4 Admi'n in Mental Health 90 (Spring 1977); Perlin, "The Right to Refuse Treatment in New Jersey," 6 Psychiatric Annals 91 (June 1976).
*237 However, the Legislature has also provided that "Every patient shall have the right to participate in planning for his own treatment to the extent that his condition permits." N.J.S.A. 30:4-24.1. The true meaning of an enactment and the intention of the Legislature in enacting it must be gained, not alone from the words used within the confines of the particular section involved, but from those words when read in connection with the entire enactment of which it is an integral part. Petition of Sheffield-Farms Co., 22 N.J. 548, 554 (1954); Palkoski v. Garcia, 19 N.J. 175, 181 (1955). Further, the Committee Statement to Senate Bill 1117 (1974) states:
This bill would incorporate in New Jersey law an affirmative and detailed section on civil rights for the mentally ill and mentally retarded. It is patterned after laws recently enacted in California, Florida, Illinois, Massachusetts, Maryland and New York. Although New Jersey law currently contains general references to civil rights of persons confined because of mental illness or mental retardation, experience indicates that a comprehensive and explicit version of these rights should be in the law. The bill reflects the decisions in a growing number of lawsuits throughout the Nation which have directed that there shall be a greater awareness of the basic human rights of persons confined because of mental illness or mental retardation.
Statutory sections are to be viewed in relation to the entire existing enactment and are to be reconciled, if possible, to effectuate the reasonably probable legislative policy, and so the general intent and object of a statute guides the interpretation of its parts. Bravand v. Neeld, 35 N.J. Super. 42, 52-53 (App. Div. 1955) Hackensack Water Co. v. Ruta, 3 N.J. 139, 147 (1949).
The State asserts that a written procedure has recently been instituted to deal with problems of this type. A treatment team consisting of a psychiatrist, a social worker and the patient will discuss the proposed course of treatment. If medication is deemed appropriate, the team will make its recommendation to the institution's medical director, whose *238 approval will be necessary. The court accepts such representation and awaits that written policy.
Thus, the State is statutorily authorized to treat involuntarily committed patients without their consent. Until N.J.S.A. 30:4-24.2(d)(1) is amended by our Legislature, the B.s in our state's institutions are protected by nothing more than the court's review, the occasional consultation of an independent expert and the promised administrative procedure.