**In the Matter of Patrick Howard DANIELSON, Alleged Mentally Ill.**

**No. C8–86–1698.**

Court of Appeals of Minnesota.

Dec. 23, 1986.

Michael R. Ring, Tanner & Ring, P.A., Hastings, for appellant Danielson.

Robert F. Carolan, Dakota Co. Atty., Karen L. Henke, Asst. Co. Atty., Hastings, for respondents.

Considered and decided by POPOVICH, C.J., and WOZNIAK and FORSBERG, JJ., with oral argument waived.

## OPINION

FORSBERG, Judge.

Danielson seeks review of findings of fact, conclusions of law, and judgment entered on September 19. The trial court found Danielson is a mentally ill person, that there was "no lesser restrictive alternative than commitment" and that the treating facility "may force medication upon him against his will" if Danielson refuses to take prescribed medications. The trial court concluded that a dual commitment to St. Joseph's Hospital and Anoka Metro Regional Treatment Center (AMRTC) was appropriate. We reverse and remand.

## FACTS

Danielson's history of mental illness dates back to an episode some four years ago when he was a college student. Danielson began saying bizarre things and having hallucinations. He responded quickly to medication and has been treated on an outpatient basis by psychiatrist Louis Flynn since that time. Danielson was voluntarily hospitalized in 1982, 1985, and early 1986.

Danielson's parents sought commitment of their son in September 1986. They testified Danielson stopped taking his medication, became disoriented, spoke irrationally, missed work, and was argumentative and threatening. He wandered aimlessly through the neighborhood, began drinking, pushed his father to the ground, and refused to climb down from a 30 foot high wall. Police were called on two occasions to assist Danielson's parents in calming him. Danielson destroyed a car by driving through fields, and had little memory of his actions. His mother testified Danielson had hallucinations, that he heard voices coming from the television, and that he was very vulnerable to others taking advantage of him. Danielson's father described his son's delusion that he was a law student, his explosive behavior, and his refusal to eat.

The court-appointed examiner was James Jacobson, a licensed consulting psychologist. Jacobson diagnosed Danielson as suffering from a significant psychiatric disorder; namely schizophrenia of a paranoid type. As a result of his illness, Danielson has deteriorated and is unable to function or to follow a conversation. His perceptions and thoughts are disordered. Jacobson cited examples of Danielson's bizarre behavior, including hallucinations, grandiose thoughts and statements, loose association of thoughts, projection of his own emotions on others, and recurring misperception of his situation. Jacobson believed Danielson was a threat to himself and others, based on several assaultive episodes which occurred in the hospital while Danielson was awaiting the commitment hearing and Danielson's behavior immediately before hospitalization.

Jacobson recommended commitment to St. Joseph's Hospital so Danielson can continue under the care of Dr. Flynn, with a "back-up" commitment to AMRTC, in case Danielson's insurance coverage for treatment at St. Joseph's expires. Jacobson reviewed the medical records, but apparently did not speak with Dr. Flynn. He was unable to decipher some of Flynn's notes in the records, but told the court Flynn strongly recommended a court order "to give medications against [Danielson's] will." Flynn was not called as a witness at the commitment hearing. Jacobson felt there was no less restrictive alternative to commitment, since halfway houses would generally require that Danielson take his medications and have a minimum of three to six months without an assault before they would accept him.

Psychiatric registered nurse Mary Davies testified Danielson's insurance coverage would pay for the expense of treatment at St. Joseph's Hospital and told the court "Dr. Flynn has stipulated in order for [Danielson] to return to St. Joe's he is [requiring] court-ordered medication."

At the conclusion of the commitment hearing, the trial court announced it found Danielson to be a mentally ill person, that

no less restrictive alternative to commitment existed, and that dual commitment was appropriate. The court "further order[ed] that in the event that Patrick refuses to take medication that either facility may force medication on him against his will." Danielson's counsel immediately moved the court to rescind its order allowing forced medication and the court denied that request.

The court's written findings and conclusions were issued the next day. The court, using a form order, found Danielson to be a mentally ill person, found there was no less restrictive alternative to commitment without specifying what alternative dispositions were considered or why they were rejected, identified no conduct upon which to base the commitment order, and "found" that either St. Joseph's Hospital or AMRTC "may force medication upon [Danielson] against his will." The conclusions of law directed commitment for an unspecified time and did not mention the administration of medications.

On appeal, Danielson does not challenge his commitment as a mentally ill person, but argues the trial court erred in directing future administration of medications. The county attorney, on behalf of Danielson's parents, argues the appeal is moot in light of Danielson's provisional discharge from the hospital and claims the trial court did not really order involuntary administration of medications.

## ISSUES

1. Is this appeal moot?

2. Did the trial court err in directing involuntary administration of medication?

3. Did the trial court fail to make required findings to support its commitment order?

4. Were confidential materials improperly included in the trial court file?

## ANALYSIS

 1. Respondents argue the appeal is moot because Danielson has been provisionally discharged from St. Joseph's Hospital and no medication was forced upon him during his hospitalization. An order which improperly authorizes future treatment is, by its nature, capable of repetition and yet evades review, and an appeal will not be dismissed simply because no facility is currently attempting to administer treatment in reliance upon the order. *In re Kinzer*, 375 N.W.2d 526, 529–30 (Minn.Ct. App.1985). Danielson has only been provisionally discharged, and may yet return to the hospital. Even a full discharge from commitment does not necessarily render an appeal moot. *See In re Cordie*, 372 N.W.2d 24, 28 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Sept. 26, 1985).

 2. Danielson cites this court's frequent opinions stressing that treatment decisions are to be made by the treating facility, and not by the committing court. *See for example, In re Smith*, 392 N.W.2d 582, 585 (Minn.Ct.App.1986), *In re Wicks*, 364 N.W.2d 844, 847 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. May 31, 1985). Respondents argue that the trial court in this case did *not* order administration of medications, since the directive that medications be forced was only contained in the findings of fact section of the written order.

Respondents characterize the court's clear language that "either facility may force medication upon [Danielson] against his will" as a mere "finding or indication that no legal impediment exists if the treating facility determines that medications administered against a patient's will is (sic) necessary for the treatment of that patient." We cannot accept this characterization. The trial court clearly intended to issue an order authorizing involuntary medication of Danielson. The court announced from the bench it would "further *order* that in the event that Patrick refuses to take medication that either facility may force medication on him against his will." (Emphasis added.)

 We next turn to the issue of whether the trial court erred in authorizing involuntary medication. It is improper for a

trial court to authorize or determine involuntary medication as a proper method of treatment at the time of the patient's commitment. *In re Moll,* 347 N.W.2d 67, 71 (Minn.Ct.App.1984); *see also* Minn.R.Civ. Commitment, 8, Comment C. Treating facilities are authorized to determine when "the use of mild tranquilizers or those therapies requiring the cooperation of the patient" is appropriate, but the hospital must seek an adversary hearing before the trial court to obtain permission to administer "electroshock treatments, one of the most intrusive forms of treatment." *Price v. Sheppard,* 307 Minn. 250, 260–63, 239 N.W.2d 905, 912–13 (1976).

The use of psychotropic medications lies in the middle range of available therapies and neither the Commitment Act nor the appellate courts have required that facilities obtain a court order to administer them without a patient's consent. *See Smith,* 392 N.W.2d at 585. The administration of psychotropic medications is monitored by state hospital treatment review boards and it is the function of the boards "to review patient refusals to accept prescribed medications." *Id.* The Commitment Act does not authorize trial courts to directly monitor the treatment of patients. *Wicks,* 364 N.W.2d at 847.

The treating facility is responsible for developing a plan for treating the patient with the goal of rendering further hospitalization unnecessary. Minn.Stat. § 253B.03, subd. 7 (1984). For reasons which are unclear, St. Joseph's Hospital apparently has no mechanism like the treatment review boards for reviewing patient refusals of medication. We decline to offer an advisory opinion on whether a private hospital, without a treatment review board, which seeks to force medications may avoid its responsibility to make treatment decisions by petitioning the court for permission pursuant to *Price v. Sheppard.* It is clear there was no serious attempt by hospital officials to obtain a court order in this case, since the treating psychiatrist did not even testify and his request for court authorization appeared only in an entry in Danielson's medical records, which was partially indecipherable. The important rights of a person subject to commitment proceedings should not be abridged by the failure of petitioners to call critical witnesses having direct knowledge of the patient's behavior, condition, and needs. *See In re Beard,* 391 N.W.2d 29, 31 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Sept. 24, 1986).

Danielson was not notified that authority to force medications would be sought at the time of his commitment hearing or given an opportunity to present witnesses (or to cross-examine the treating psychiatrist) on the present medical need for such an order. The order is not limited in time and it purports to give the treating facility carte blanche to force any medication upon Danielson at any time. *Cf. Kinzer,* 375 N.W.2d at 532 (court order for future administration of electroconvulsive therapy improper in absence of proof that patient currently requires treatment for a specific time). The trial court in this case improperly allowed the hospital to evade its responsibility to determine whether it was presently necessary to administer medications without Danielson's consent and the court failed to make an adequate inquiry to determine whether a court order was necessary or appropriate.

3. This court will examine a commitment order for "compliance with the Minnesota Commitment Act, including the making of required findings of fact and conclusions of law, and an evaluation of less restrictive alternatives considered and rejected." *In re Peterson,* 356 N.W.2d 746, 748 (Minn.Ct.App.1984). The commitment order must be "justified by findings based upon evidence at the hearing." Minn.R.Civ. Commitment 11.01. The statute requires the trial court to "specifically state the proposed patient's conduct which is a basis for determining that each of the requisites for commitment is met" and to "also include a listing of less restrictive alternatives considered and rejected by the court and the reasons for rejecting each

alternative." Minn.Stat. § 253B.09, subd. 2.

█ The trial court must consider alternatives to commitment and choose the least restrictive available placement if commitment is ordered. "The consideration of less restrictive alternatives is a matter of great significance." *Moll,* 347 N.W.2d at 70. The drafters of the Commitment Act clearly intended to require specificity in the findings of the trial courts, and we have often stressed the need for findings on each of the statutory requisites with a clear recitation of the evidence relied upon in reaching the court's conclusions. *See In re Adams,* 352 N.W.2d 117, 119 (Minn.Ct. App.1984). The trial court's findings in this case summarily state "there is no lesser (sic) restrictive alternative than commitment," and list neither the alternatives considered nor the reasons for rejecting them. No specific conduct of Danielson is identified as supporting commitment. Finally, the trial court made absolutely no mention of the term of Danielson's commitment, although an initial commitment may not exceed six months. Minn.Stat. § 253B.09, subd. 5.

█ The findings are wholly inadequate to support commitment, although the evidence amply supports a determination that Danielson is a mentally ill person in need of treatment. There is no evidence in the record on alternatives to commitment, although there is some evidence on the issue of an appropriate placement for Danielson after commitment. We therefore remand for the trial court to make findings as required by the statute. *See In re Stewart,* 352 N.W.2d 811, 813 (Minn.Ct.App. 1984). In light of Danielson's provisional discharge from the hospital since the time of the initial commitment order, the trial court should inquire into whether commitment remains necessary.

█ 4. Danielson's medical records were introduced into evidence at the commitment hearing. The records and pre-petition screening reports are still contained in the trial court file which was forwarded to this court. Although information from the patient's medical records is relevant to the pre-petition screening process, all data collected from medical records is private and may not be disseminated to the public. Minn.Stat. § 253B.07, subd. 1(b); *In re Morton,* 386 N.W.2d 832, 834 (Minn.Ct. App.1986). This information is admissible at the commitment hearing, but this court has previously expressed its concern that "private data gathered from medical records not be disclosed to the public." *Id.* at 835.

█ The screening reports in this case specify that information was collected from Danielson's hospital records. We have suggested that medical records and screening reports be withdrawn following a hearing and not be made part of the public file. *Id.* At the time of appeal the party having possession of the medical records introduced at trial should forward the exhibits to the clerk of the appellate courts with a notation that they are not to be accessible to the public. *See* Minn.R.Civ.App.P. 111.-01. Alternately, the trial court may direct that these documents be retained by the clerk of the trial court under seal and forwarded to this court with the balance of the file.

## DECISION

The trial court's order for future involuntary administration of medication is improper and is reversed. The trial court failed to make adequate findings to support its commitment order and erred in permitting medical records and screening reports to be placed in the public file. On remand, the trial court may choose to take evidence on Danielson's current need for commitment, in light of his recent provisional discharge. If the trial court concludes that commitment continues to be appropriate, it shall make detailed findings to support that conclusion.

Reversed and remanded.