**Homer JARVIS, individually and on behalf of all others similarly situated, Appellants,**

v.

**Leonard W. LEVINE, in his official capacity as Commissioner of Human Services, et al., Respondents.**

No. C2–86–1633.

Court of Appeals of Minnesota.

April 7, 1987.

Review Granted July 2, 1987.

Charles H. Thomas, Eugenia L. Hedlund, Mankato, Mark A. Bohnhorst, Michael W. Hagedorn, St. Paul, for appellants.

Hubert H. Humphrey III, Atty. Gen., Mary L. Stanislav, Kathy Meade Hebert, Sp. Asst. Attys. Gen., St. Paul, for respondents.

Heard, considered and decided by POPOVICH, C.J., and FOLEY and NIERENGARTEN, JJ.

## OPINION

FOLEY, Judge.

This case involves the qualified right of a state hospital patient, involuntarily committed as mentally ill and dangerous, to refuse neuroleptic medication in nonemergency circumstances and the correlative duties of state officials prior to forced administration of such medication. Appellant Homer Jarvis commenced this action for damages pursuant to 42 U.S.C. § 1983 and for declaratory and injunctive relief on behalf of himself and others similarly situated.[1] Four claims are asserted in the complaint: (1) that the Minnesota Department of Human Service (DHS) employees failed to comply with the DHS Involuntary Medication Policy; (2) that failure to follow DHS policy violated appellant's constitutionally protected rights to liberty and privacy; (3) that the DHS violated appellant's statutory right to treatment; and (4) that the absence of judicial review prior to involuntary administration of medication violated appellant's procedural due process rights.

Respondents Leonard W. Levine, Dr. Brian Gottlieb and Dr. Steven Doheny, in their official capacities, moved for summary judgment on all counts and asserted that they were immune from damages. Appellant moved for partial summary judgment on the fourth count only, seeking a determination that he was entitled to judicial review of any future plan to medicate him with a major tranquilizer.

In June 1986, the trial court granted respondents' motion for summary judgment on all counts and denied appellant's

1. Although the complaint is framed as a class action suit, appellant did not move the trial court to certify the class.

motion for partial summary judgment. Judgment was subsequently entered. Appeal is taken from those portions of the judgment denying any right to judicial review of the medication decision in this case or future cases and the finding that respondents were immune from damages. We affirm as modified.

### FACTS

Appellant was civilly committed as mentally ill and dangerous to the Minnesota Security Hospital in March 1977 following the shooting death of his sister. He has undergone four courses of involuntary neuroleptic medications since then.[2] This case involves the most recent of these episodes.

Appellant's mental illness, diagnosed as paranoid schizophrenia, includes a fixed delusion that hospital personnel and court officials have conspired to commit him indefinitely. In particular, appellant believes that the neuroleptic medications he receives are harming and poisoning him. Appellant's illness has led to incidents of verbal abuse and physical violence, as well as threats against staff, family and others. Appellant is nonetheless considered intelligent and articulate, and his self-care skills are entirely intact. An essential feature of his condition is his lack of insight into his illness, specifically that he is ill or in need of professional help. As a result, for most of his stay at Security Hospital, appellant has refused to cooperate in treatment programming, group therapy, individual counseling and psychological interviews.

*Neuroleptic Treatment from March 1977 to May 1982*

Appellant was first placed on neuroleptic medication in March 1977. Within one month, he began complaining of tremors in his extremities, blurred vision, tiredness and difficulty with urination. In August 1977, medical reports note that appellant was experiencing severe stiffness of the joints and marked "akathesia," a state of inner restlessness which often causes constant repetitive motions, particularly of the extremities. Appellant's examining physician doubted that significant progress would be made, and medication was discontinued in the summer of 1978.

In November 1978, appellant was restarted on a different neuroleptic medication because of these previous side effects. After a few weeks on this alternate medication, appellant calmed down and became more content. The dosage was increased and supplemented with other drugs. In December 1979, Dr. J.C. Wohlrabe, a psychiatric consultant, noted that appellant appeared "much more content with himself in recent months than a year ago. His motor difficulties related to medication side effects are insignificant at present."

In February 1980, respondent Dr. Steven Doheny, a psychiatric consultant who later became appellant's treating physician, discontinued the neuroleptic medication for a trial period based on his finding of severe akathesia as well as the apparent inability of the drugs to penetrate appellant's delusional system. Appellant remained off neuroleptic medication for approximately one year.

The third course of neuroleptic treatment commenced in February 1981 and ended in May 1982 when appellant refused further medications. Psychiatric consultant Dr. Paul J. Melichar opted to discontinue rather than force the medication "with the full expectation that [appellant] will show a fairly rapid clinical deterioration."

In the intervening months, appellant sought to be transferred from Security Hospital to an open hospital. A special review board denied the petition, concluding that transfer could not be accomplished with a reasonable degree of safety to the public. In September 1984, a three-judge

---

**2.** The terms "neuroleptic," "anti-psychotic," "psychotropic," and "major tranquilizer" are used interchangeably to describe a category of drugs affecting the nervous system so as to produce sedation. Medical literature suggests that "neuroleptic" is more medically precise in describing this class of drugs and will, accordingly, be used predominantly throughout this opinion. *See* Gaughan and LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution,* 4 Law & Psychology Review 43, 46 (1978).

supreme court appeal panel upheld denial of the transfer. Of particular significance is the following notation by the appeal panel: [3]

> Throughout his hospitalization of seven years [appellant] has continued to be uncooperative, has been off his medication since May of 1982 and continues to be verbally hostile to others, patients and staff alike, *and since he went off his medication in May of 1982, his existence of hostility has increased.* He is presently in * * * a slow discharge unit and while efforts are made to involve him in the group treatment program, he continues to be uncooperative. Indeed, it is suggested that this type of mental illness enhances the propensity to not cooperate.

(Emphasis supplied.)

The appeal panel's decision was eventually affirmed by this court in *Jarvis v. Levine*, 364 N.W.2d 473 (Minn.Ct.App.1985). On December 6, 1984 (during pendency of the appeal in *Jarvis v. Levine*), a fourth course of neuroleptic treatment was initiated. To implement this fourth regimen of treatment, adherence to the Involuntary Medication Policy contained within the Institutions Manual Guidelines (Manual) promulgated by the Department of Public Welfare in October 1981 was required. Compliance with these standards and whether such procedures comport with statutory and constitutional demands form the basis of this appeal.

*Involuntary Medication Policy*

The Involuntary Medication Policy sets forth substantive and procedural guidelines which must be followed by Minnesota state hospital personnel prior to involuntary administration of neuroleptic medication in nonemergency cases.[4]

*Substantive Requirements*

Two predicate elements must be found in *non* emergency cases:

a. The patient lacks the ability to engage in a rational decision-making process regarding the acceptance of treatment and is unable to weigh the possible benefits and risks of treatment (the mere fact of disagreement about medication does not in itself constitute evidence of inability); and

b. The patient's behavior has been observed and documented and the patient is found to be suffering from a major mental illness with severe functional incapacity * * *.

Section XII–4030, 2.a. and 2.b. Once these prerequisite findings are made, one of two conditions must additionally be found to initiate neuroleptic treatment. Either:

(1) The patient has a documented history of clearly demonstrated reductions of symptoms during previous treatment with the [neuroleptic drug] and of clearly demonstrated deterioration of function when the [neuroleptic drug] was discontinued; *or*

(2) The nature of the documented behavior of a committed patient is sufficiently severe and of such duration that the known benefits clearly outweigh the possible risks of the medication.

Section XII–4030, 2.c.(1) and (2) (emphasis supplied).

If the second above condition is found, neuroleptic medications may be involuntarily administered for a trial period provided, however, that:

(a) The trial may not exceed 30 days in length; and

(b) At the end of 30 days the treatment will be evaluated by the treatment

---

**3.** The appeal panel's decision in its entirety was included as part of respondents' appendix in their motion for summary judgment and is thus properly a part of the record in this appeal. *See* Minn.R.Civ.App.P. 110.01.

**4.** The Statement of Policy acknowledges that while neuroleptic medications, termed "Major tranquilizers," are known to be "an effective and appropriate treatment for a number of psychiat-

ric disorders," some patients may "seriously object to this form of therapy and refuse to take the prescribed medication despite efforts by the hospital staff to gain the patient's cooperation." The statement of policy expressly requires that major tranquilizers shall be involuntarily administered to state hospital patients *"only* as described herein." (Emphasis supplied.)

team, and if the evaluation establishes the efficacy of the [neuroleptic drug] for that patient (using the criteria in XII–4030, 2.c.(1)), the treatment team may initiate another request for involuntary administration of the [neuroleptic drug] for that patient.

Section XII–4030, 2.c.(2)(a) and (b).

In judging the risks and benefits of forced medication, the Manual further requires that the treatment team consider "the possible non-physical side effects, * * such as anger, fear, and distrustfulness which may result from involuntary administration of medication." § XII–4030, 2.c.(3).

*Procedural Requirements*

1. *Documentation and recommendations of the treatment team.* (§ XII–4050)

In order to proceed with involuntary medication treatment in nonemergency cases, the patient's treatment team must document ten items which bear directly on the substantive decision to utilize forced medication including: "medical necessity" for the medication, existence of an "individualized treatment plan", the patient's reason for refusal, "[c]onsideration of less intrusive therapies or treatments," "past side effects," potential risks and benefits, and the probable course of treatment if neuroleptic drugs are not administered.

2. *Certification of need for involuntary treatment.* (§ XII–4060)

This written statement by a physician must (1) describe the patient's clinical status, provide a working diagnosis and indicate preferred treatment for the condition; (2) list major treatment alternatives considered and the reasons for their rejection; (3) indicate the patient's expected response in nonemergency cases; and (4) certify that criteria for involuntary treatment has been met and that procedures have been completed.

. 3. *Review and approval by facility Treatment Review Panel (TRP).* (§ XII–4070)

In nonemergency situations, the TRP decides whether requirements of the directive have been followed and whether the patient's wishes should be overruled pursuant to those standards. The TRP may approve or disapprove of the proposed medication and set conditions on its approval. A written summary of its decision and findings is required in all cases. Either the attending physician or the patient may appeal the decision of the TRP to the facility medical director, who makes a final decision on whether involuntary medication may proceed.

4. *Review by hospital Review Board.* (§ XII–4080)

The function of the Review Board is to determine whether procedural requirements were followed by the treatment team and TRP "and the extent to which the rights and dignity of the patients were considered and protected." The Review Board's recommendations are presented to the Commissioner of Human Services. The Review Board is *not* responsible for assessment of the clinical decision itself but rather, "may give suggestions concerning the case which it believes may be useful to the treatment team, the TRP, or the facility medical director."

*Involuntary Medication Policy as Applied to this Case*

On October 10, 1984, the TRP disapproved a request by Doheny (appellant's treating physician) for forced medication, concluding that "[i]t does not appear justifiable to use medication with evidence that [neuroleptic drugs] result in little therapeutic gains and cause significant side effects." Doheny sought reconsideration of the TRP decision based on his review of appellant's medical records, which "seem[ed] to indicate the possibility of a medication response, at least to the degree that his symptoms would diminish and allow him to cooperate with his treatment plan, his doctors, and his attorneys and make some progress towards discharge."

On October 25, 1984, the TRP again disapproved medication, reiterating its previous conclusion that the benefits of medication did not outweigh the potential for

serious side effects in the absence of "a history of clearly documented reduction of symptoms."

Doheny's appeal of the TRP decision to facility medical director Brian Gottlieb was untimely. In the interim, the Review Board examined the case and affirmed the TRP. Gottlieb accepted the Review Board's decision not to initiate treatment.

On November 27, 1984, Doheny initiated a second request for involuntary medication. The TRP reinstated its original decision and Doheny appealed to Gottlieb. On December 5, 1984, Gottlieb overruled the decision of the TRP and approved involuntary medication of appellant, finding that appellant has a major mental illness, that he is unable to make a reasoned decision because he does not recognize the existence of his condition, and that his ability to cooperate in other treatment programs was enhanced during past trials of medication. Gottlieb indicated that the presence of side effects, particularly tardive dyskinesia, could call for reevaluation, but that most of the side effects appellant complained of were not usually associated with medication of this type.

On December 7, 1984, the Review Board reviewed and disapproved of involuntary medication on the basis that past medication trials had not demonstrated sufficient beneficial results.

Appellant's case was not reviewed again by the TRP until January 30, 1985, which once again reaffirmed its original decision not to support involuntary medication. Although appellant had demonstrated "some reduction in his anger and hostility and * * an increased ability to involve himself in unit activities," the TRP concluded "that the gains made with the medications do not outweigh the patient's concerns and desires not to be medicated." Doheny appealed. On February 6, 1985, Gottlieb overruled the TRP's decision, concluding that:

> [W]e will at some point have to discontinue medication in response to [appellant's] request; however the trial of medication is by no means complete * * *. In view of the fact that once this medication trial is terminated it will probably be several years before anyone is willing to try again, I do feel that the clinical possibilities should be more exhaustively explored and I am * * * authorizing * * * Dr. Doheny to keep trying a bit longer.

Subsequent decisions by the TRP in April and May of 1985 to discontinue medication were overruled by Gottlieb. In July 1985, medical reports reviewed by the TRP indicated that while appellant's degree of paranoia was subsiding, he was also developing tardive dyskinesia, a serious side effect of neuroleptic medication. Doheny testified by deposition that this side-effect was often alleviated by medications appellant refused to take. The TRP continued to conclude that involuntary administration of neuroleptic medication was unwarranted, and Gottlieb continued to overrule their decisions.

In September 1985, Dr. Leonard Fielding, who was then the acting medical director, reviewed Doheny's latest appeal from the TRP and concluded that, although documentation of reduced symptoms during appellant's involuntary treatment supported the decision to medicate at that time, involuntary medication of appellant should be discontinued:

> Considering * * * the length of treatment [and] the amount of improvement, Mr. Jarvis complaints about side effects and the likelihood that this specific medicinal agent will not move him any farther toward living in a less restrictive environment, the appeal is denied.

## ISSUE

Did the trial court err as a matter of law in determining that no right to judicial review of a decision by Minnesota state hospital personnel to administer involuntary neuroleptic medications in nonemergency circumstances exists in this case or in future cases?

## ANALYSIS

It is clearly established that when reviewing an entry of summary judgment, an

appellate court must determine whether genuine issues of material fact exist and whether the trial court erred in applying the law. Minn.R.Civ.P. 56.03; *Schuyler v. Metropolitan Transit Commission,* 374 N.W.2d 453, 455 (Minn.Ct.App.1985). Since the issue of a right to judicial review is a question of law, the trial court's decision is not binding on this court. *See A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.,* 260 N.W.2d 579, 582 (Minn.1977). We note from the outset that summary judgment was appropriate in this case. However, we find it necessary to discuss the issue of judicial review because of the importance of that issue and the potential for reoccurrence.

Whether a committed mental patient, who has exhausted administrative remedies, has a constitutional right to refuse treatment with neuroleptic or antipsychotic medication in a nonemergency situation is an issue of first impression for this court. However, we are not entirely without guidance. In *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976), a minor involuntarily committed to a state hospital was given a series of electroshock treatments against the express wishes of the minor's guardian. The guardian sued for damages, asserting a violation of the minor's civil rights under 42 U.S.C. § 1983 and common law claims of assault and battery. The trial court granted summary judgment in favor of the defendants, concluding that the electroshock treatments did not constitute cruel and unusual punishment under the eighth amendment to the United States Constitution or a violation of the minor's privacy. The supreme court affirmed.

Two points addressed in *Price* are noteworthy for our purposes. First, the court expressly recognized that electroshock treatments infringe upon a patient's constitutionally protected interests in privacy, personal security and personal dignity.

> At the core of the privacy decisions, in our judgment, is the concept of personal autonomy—the notion that the Constitution reserves to the individual, free of governmental intrusion, certain fundamental decisions about how he or she will conduct his or her life.

*Id.* at 257, 239 N.W.2d at 910 (footnote omitted).

This "emerging" constitutional right of privacy, though not absolute, must be measured against certain state interests with "the balance turning on the impact of the decision on the life of the individual. As the impact increases, so must the importance of the state's interest." *Id.* at 257, 239 N.W.2d at 910. The court cautioned:

> [O]nce justified, the extent of the state's intrusion is not unlimited. It must also appear that the means utilized to serve the state's interest are necessary and reasonable, or, *in other words, in light of alternative means, the least intrusive.*

*Id.* (emphasis supplied) (footnote omitted).

Second, the court held that although the state's interest was sufficient to justify both the initial commitment decision and the state's obligation to treat committed persons, the "more important question" was the "necessity and reasonableness of the means utilized by the state in treating an involuntarily committed patient." *Id.* at 259–60, 239 N.W.2d at 911. The court noted that techniques for treatment of psychological disorders ranged in severity and coerciveness from "the least intrusive forms such as milieu therapy (behavior changes produced by manipulation of the patient's environment) and psychoanalysis, to drug, aversion, or electroconvulsive therapy, and ultimately to psychosurgery." *Id.* at 260, 239 N.W.2d at 911. "As the techniques increase in severity, *so do the risks of serious and long-lasting psychological or neurological damage." Id.* at 260, 239 N.W.2d at 912 (emphasis supplied) (footnote omitted).

Because the potential impact of the more intrusive forms of treatment is so great, we are reluctant in those cases where the patient or guardian refuse their consent, to leave the imposition of the more intrusive forms of treatment

solely within the discretion of medical personnel at our state hospitals.

*Id.* at 262, 239 N.W.2d at 912–13.

Although the court in *Price* held for the defendants on grounds of immunity, it established procedures to be used in future cases involving more "intrusive" therapies:

> (1) If the patient is incompetent to give consent or refuses consent or his guardian other than persons responsible for his commitment also refuses his consent, *before more intrusive forms of treatment may be utilized, the medical director of the state hospital must petition the probate division of the county court in the county in which the hospital is located for an order authorizing the prescribed treatment;*
>
> (2) the court shall appoint a guardian ad litem to represent the interests of the patient;
>
> (3) in an *adversary proceeding,* pursuant to the petition, *the court shall determine the necessity and reasonableness of the prescribed treatment.*

*Id.* at 262, 239 N.W.2d at 913 (emphasis supplied) (footnote omitted). In balancing the patient's need for treatment against the intrusiveness of the prescribed treatment, the following factors should be considered:

> (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) *the risks of adverse side effects,* (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) *the patient's ability to competently determine for himself whether the treatment is desirable.*

*Id.* (emphasis supplied) (footnote omitted).

While it is clear from *Price* that these procedures must be adhered to when electroshock treatment or psychosurgery (the most intrusive therapy on the court's continuum) are contemplated, the court expressly left undecided the issue of whether treatment with neuroleptic drugs triggers similar procedural protections.

### 1. *Substantive Rights*

Since *Price,* a number of decisions have addressed the impact of forced neuroleptic treatment on institutionalized mental patients on the basis of either state or federal law. Significantly, the United States Supreme Court has not squarely addressed this issue.

In *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), the Supreme Court "assumed" for the sake of discussion that involuntarily committed mental patients had a constitutionally protected liberty interest in freedom from bodily invasion, intimating "no view as to the weight of such interests in comparison with possible countervailing state interests." *Id.* at 299 n. 16, 102 S.Ct. at 2448 n. 16.

*Mills* was ultimately remanded in light of *In re Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981), a decision grounded in a right of privacy under the federal constitution as well as Massachusetts common law that held, absent an emergency, antipsychotic drugs could only be administered to *noninstitutionalized* mental patients by court order. *Mills,* 457 U.S. at 301–02, 306, 102 S.Ct. at 2449–2450, 2452. *See also Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed *mentally retarded* person has constitutionally protected liberty interest in safe conditions of confinement and freedom from *physical* bodily restraints).

Essentially, whether the right to refuse treatment is labeled a liberty interest or a privacy right is not determinative, since the right of privacy is subsumed within the fourteenth amendment's liberty interest. *See Whalen v. Roe,* 429 U.S. 589, 598–99 nn. 23, 24, 97 S.Ct. 869, 875–76 nn. 23, 24, 51 L.Ed. 64 (1977).

In *Mills,* the Court further noted that where state law provides greater substantive rights than those found under federal law, "the broader state protections would define the actual substantive rights possessed by a person living within that

State." *Mills*, 457 U.S. at 300, 102 S.Ct. at 2449.[5] Appellant argues that in accordance with the policy of judicial restraint and avoidance of constitutional questions, this court must first look to state law sources to determine his substantive rights. We agree.

### Institutions Manual Guidelines

Appellant asserts that the Manual creates greater substantive rights than those found under federal law, including the right of institutionalized mental patients to be free from the unjustified physical intrusions into their bodies and into their mental processes represented by the side effects of neuroleptic drugs. He argues that since the Manual places substantive limitations on the exercise of official discretion and provides particularized criteria to guide decision makers, patients have a legitimate expectation that such rules will be followed. *See, e.g., Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7–8, 99 S.Ct. 2100, 2103–2104, 60 L.Ed.2d 668 (1979).

Respondents acknowledge that the Manual creates a limited right to refuse neuroleptic treatment but argue that this right is coextensive with rights recognized under the federal constitution, specifically that involuntary administration of neuroleptic medication may be considered a "bodily restraint." *See Youngberg*. We agree. At best, the Manual creates a *qualified* right to refuse treatment, a right no greater than that conferred under the federal constitution. *See Price*, 307 Minn. at 257, 239 N.W.2d at 910.

---

**5.** Decisions holding that a mental patient has a qualified right to refuse neuroleptic treatment in non-emergency situations, predominantly on the basis of state law include: *People v. Medina*, 705 P.2d 961 (Colo.1985) (both statutory scheme and common law expressly recognize the right of an involuntarily committed mentally ill patient to legitimately refuse treatment posing a significant risk to physical well being); *Rivers v. Katz*, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337 (1986) (involuntarily committed mental patients have a fundamental right to refuse antipsychotic medication under due process clause of the state constitution); *In re Mental Health of K.K.B.*, 609 P.2d 747 (Okla.1980)

### Statutory Scheme

In Minnesota, commitment is a judicial determination that committed persons are incompetent to make decisions concerning the treatment of their mental illness. Legal rights unrelated to treatment of mental illness are unaffected.

> Commitment or treatment of any patient * * * is not a judicial determination of legal incompetency *except to the extent provided in section 253B.03, subdivision 6.*

Minn.Stat. § 253B.23, subd. 2(a) (1986) (emphasis supplied). Minn.Stat. § 253B.03, subd. 6 (1986), in turn, provides:

> A patient has the right to prior consent to any medical or surgical treatment, *other than the treatment of mental illness*, mental retardation or chemical dependency.

Minn.Stat. § 253B.03, subd. 6 (1986) (emphasis supplied). The state does have an obligation to insure that:

> A person receiving services under this chapter has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further custody, institutionalization, or other services unnecessary.

Minn.Stat. § 253B.03, subd. 7 (1986). The state's duty to treat patients

> can be articulated as the need for the state to assume the decision-making role regarding the psychiatric treatment for one who, presumptively, based on the fact of commitment on the ground of

---

(institutionalized mental patient has constitutional right to meaningful treatment under state law). *See also Large v. Superior Court*, 148 Ariz. 229, 714 P.2d 399 (1986) (convict confined to mental health treatment facility has due process right under state constitution to be free from arbitrary forcible administration of psychotropic drugs). *But see In re Hospitalization of B*, 156 N.J.Super. 231, 383 A.2d 760 (1977) (state hospital had right to treat institutionalized mental patient with psychotropic medication without his consent where state legislation did not recognize right of involuntarily committed patients to refuse such medication).

mental illness, is unable to *rationally* do so for himself.

*Price,* 307 Minn. at 259, 239 N.W.2d at 911 (footnote omitted) (emphasis in original).

Under the *parens patriae* doctrine, if that interest of the state is sufficiently important to deprive an individual of his physical liberty, it would seem to follow that it would be sufficiently important for the state to assume the treatment decision. *Id.* Similarly, under the current statute, the state's obligation to treat the patient is necessarily linked to its ability to administer treatment without the patient's consent, *provided* the patient is afforded due process.

■ The statutory presumption of incompetency to make psychiatric treatment decisions when commitment is premised on a finding of mental illness distinguishes Minnesota from jurisdictions holding that *state* law confers a qualified right to refuse neuroleptic treatment. *See, e.g., People v. Medina,* 705 P.2d at 967 (in Colorado, involuntarily committed mental patients "whether competent or incompetent to participate in treatment decisions have the right under appropriate circumstances to legitimately refuse treatment that poses a significant risk to their well-being"); *Rivers,* 67 N.Y.2d 485, 494, 504 N.Y.S.2d 74, 78, 495 N.E.2d 337, 341–42 (1986) ("neither the fact that appellants are mentally ill nor that they have been involuntarily committed, without more, constitutes a sufficient basis to conclude that they lack the mental capacity to comprehend the consequences of their decision to refuse medication that poses a significant risk to their physical well-being"); *K.K.B.,* 602 P.2d at 749 (in Oklahoma, "competency is not a medical decision and should not merge with the commitment decision. * * * Commitment in an institution does not necessarily mean a person is incapable of appropriately deciding whether or not he prefers to be treated with psychotropic drugs").

The current Minnesota Commitment Act does not confer a right to refuse neuroleptic treatment upon institutionalized mentally ill patients. Nor does such a right derive from the Minnesota Constitution or from common law. Presumably, if such a right existed, the *Price* court, in accordance with the practice of judicial restraint, would have founded its decision on state law.

### 2. *Procedural Protections*

Just as a state can create substantive liberty interests more extensive than those existing under the federal constitution, so too can it confer *procedural* protections that extend beyond those minimally sufficient to satisfy constitutional guarantees of due process. *Mills,* 457 U.S. at 300, 102 S.Ct. at 2449. "If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State." *Id.*

As applied to the facts of this case, the procedural issue is simply this: is neuroleptic treatment an "intrusive" therapy? If so, the procedural protections set out in *Price* must be followed. If not, we must determine whether the procedures outlined in the Manual meet due process requirements by adequately protecting an institutionalized mental patient's constitutional right to be free from unjustified bodily intrusions.

This court has been faced on previous occasions with the intrusiveness of neuroleptic drugs but did not directly address the question until *In the Matter of Danielson,* 398 N.W.2d 32 (Minn.Ct.App.1986). *See In re Smith,* 392 N.W.2d 582, 585 (Minn.Ct.App.1986) (challenge by committed patient to forced administration of antipsychotic drugs not considered when patient failed to raise issue before trial court); *In re Moll,* 347 N.W.2d 67 (Minn.Ct.App.1984) (trial court's authorization of psychiatric medications as part of its commitment order bypassed the administrative process and was thus premature). *See also In re Wicks,* 364 N.W.2d 844, 847 (Minn.Ct.App. 1985), *pet. for rev. denied,* (Minn. May 31, 1985) (preparation and monitoring of treatment program for mentally retarded individual committed to state institution func-

tion of hospital review board, not committing court).

In *Danielson,* an involuntarily committed mentally ill patient appealed from an order by the commitment court directing involuntary administration of psychotropic drugs. Citing *Moll,* this court held that the trial court erred in ordering involuntary administration of medication in its commitment order and in failing to make adequate findings to support the commitment. In so holding, we stated that "use of psychotropic medications *lies in the middle range of available therapies* and neither the Commitment Act nor the appellate courts have required that facilities obtain a court order to administer them without a patient's consent." *Danielson,* 398 N.W.2d at 36 (emphasis supplied). Appellant nonetheless argues that the risk of adverse side effects posed by neuroleptic treatment establishes that the procedure set out in *Price* must be adhered to.[6]

We do not dispute that discontinuation of neuroleptic medication would be appropriate in cases where an institutionalized mental patient suffers severe side effects from the drugs without clear documentation of behavioral improvement. However, in light of our comments in *Danielson* and evidence that the side effects of neuroleptics vary in patients depending on the particular drug, the dosage level and the frequency and duration of the treatment, we decline to fashion a rule that involuntary administration of neuroleptic medication is intrusive per se, requiring that the *Price* procedure be followed. Neuroleptic therapy does not clearly rise to the level of intrusiveness of electroshock treatments or psychosurgery.

The Supreme Court has rejected the "least restrictive alternative" analysis as the proper standard for assessing whether a state has adequately protected an involuntarily committed mentally retarded person's freedom from physical bodily restraint; in its place is substituted a "professional judgment" standard. "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (Seitz, J., concurring). As long as restrictions on the patient's liberty interests were imposed as a result of the exercise of professional judgment, due process was satisfied. *Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461. Moreover, the professional's decision is presumptively valid unless shown to be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462.

Although *Youngberg* dealt specifically with the rights of an involuntarily committed *mentally retarded* individual to be free from *physical* bodily restraints, it is apparent by the Court's action in vacating and remanding *Rennie v. Klein,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), that it intended to extend the "professional judgment" standard to an involuntarily committed mentally ill patient's right to refuse antipsychotic medication. On remand in *Rennie,* the Third Circuit held that the *Youngberg* standard controlled the issue of involuntary administration of antipsychotic drugs to institutionalized persons, although the court did not agree on the precise application of this standard. *Rennie,* 720 F.2d 266 (3d Cir.1983).

---

**6.** Among the side effects experienced are muscular (drowsiness, inability to sit still, tremors that mimic Parkinson's disease); nonmuscular (blurred vision, dry mouth and throat, weight gain, low blood pressure, skin rash and skin discoloration, cardiovascular changes); and the most serious, tardive dyskinesia, a potentially permanent condition that often manifests itself in facial contortions and may include involun-

tary movement of the extremeties and pelvic area. *See Davis v. Hubbard,* 506 F.Supp. 915, 928–29 (N.D.Ohio 1980) (expansive discussion of documented side effects from psychotropic drugs). *See also Rivers,* 67 N.Y.2d at 490 n. 1, 504 N.Y.S.2d at 76 n. 1, 495 N.E.2d at 339 n. 1; *Roe,* 383 Mass. 415 at 435–442, 421 N.E.2d 40 at 52–54; *K.K.B.,* 609 P.2d at 748–49 n. 3.

It is important to note, however, that upon remand in *Rennie*, all but one of the judges, writing in four separate opinions, determined that the New Jersey procedures were adequate to protect substantive rights of the mentally ill. In so finding, the Third Circuit noted that the regulations established a professional review system, requiring the physician to seek approval from the treatment team if the patient withholds consent, and review by the medical director (or designee) of a decision to medicate a patient not adjudicated incompetent by a court. *Rennie*, 720 F.2d at 274.

Other decisions have upheld similar regulations when they provide an internal reviewing process to assure that professional judgment is, in fact, exercised. *See, e.g., Project Release v. Prevost*, 722 F.2d 960, 980–81 (2d Cir.1983) (New York regulations providing for three levels of review by medical personnel other than the treating physician, right to legal representation at all levels, facially satisfies federal due process); *R.A.J. v. Miller*, 590 F.Supp. 1319, 1322–23 (N.D.Tex.1984) (weighing of probable risks and benefits of treatment, accuracy of diagnosis, existence of alternative forms of treatment as well as two-tiered medical review incorporated into Massachusetts regulations, satisfies federal due process).

Significantly, appellant concedes that the Manual provides an opportunity for the exercise of professional judgment. Nonetheless, he argues that the least restrictive alternative principle utilized in *Price* and embodied in the Minnesota Commitment Act remains a vital and preferred analysis in this jurisdiction. *See In re Harhut*, 385 N.W.2d 305, 311 (Minn.1986); *County of Hennepin v. Levine*, 345 N.W.2d 217, 219 (Minn.1984). We do not doubt the vitality of the least restrictive alternative analysis in commitment decisions; however, this principle was never intended to vitiate the exercise of professional judgment.

■ The Commitment Act clearly places decisions as to treatment of involuntarily committed mentally ill patients in the hands of mental health professionals. *See Danielson*, 398 N.W.2d at 35; *Smith*, 392 N.W.2d at 585; *In re Pope*, 351 N.W.2d 682, 683 (Minn.Ct.App.1984); *Moll*, 347 N.W.2d at 71. This clear legislative intent, combined with our recognition that *Price* was decided without benefit of the Supreme Court's decision in *Youngberg*, leads us to conclude that the professional judgment standard is applicable in assessing an involuntarily committed mentally ill patient's qualified constitutional right to refuse neuroleptic treatment.

■ Since it is conceded that the Manual provides for the exercise of professional judgment, due process requirements have been met. We expressly note, however, that the Manual sufficiently incorporates the least restrictive alternative principle by requiring, prior to initiation of neuroleptic treatment in nonemergency cases, documentation that "less intrusive therapies or treatments" were considered and completion of a certificate requiring in part a list of "major treatment alternatives considered and the reasons for their rejection."

■ Appellant contends that he was entitled to post-medication judicial review of the facility medical director's decision. He asserts that post-medication judicial review is necessary to determine the appropriateness of damages when neuroleptics were forced upon him despite the TRP's consistent findings that such treatments were not warranted. We disagree. As applied to appellant, the issue is moot.

Appellant did not offer evidence to dispute the conclusion that the medical director exercised professional judgment in overruling the TRP or to dispute the conclusion that his physician exercised professional judgment in initiating and continuing treatment. Although his expert, Dr. J.M. Rauenhorst, stated in a September 1985 report that he would not use neuroleptics in treating appellant, Rauenhorst acknowledged that the question of whether the benefits in using the medication out-

weighed the harm was ultimately a "value judgment." Respondents' expert, Dr. James Mitchell, stated in an affidavit that Doheny acted in accordance with psychiatric professional standards, and Dr. Leonard Fielding expressly noted in his decision terminating neuroleptic treatment that appellant's documented history "clearly supported sound clinical judgment to attempt the present course of treatment."

While damages on this record are inappropriate as a matter of law, this does not mean that post-medication review is foreclosed in the future. Although the Manual expressly states that the medical director, not the TRP, makes the final decision on whether involuntary neuroleptic therapy should proceed, he or she may not act indiscriminately. Compliance with the Manual is mandatory when involuntary neuroleptic treatment is proposed. If the substantive and procedural criteria are not adhered to by mental health professionals, or if a decision to medicate substantially departs from accepted "professional judgment, practice, or standards" in nonemergency cases, an institutionalized mental patient might have a claim for damages.[7]

While we uphold the trial court in this case, the thrust of our opinion is that an institutionalized mental patient has a qualified right, synonymous with his or her rights under the United States Constitution, to refuse neuroleptic treatment in a nonemergency situation subject to the exercise of professional judgment by state hospital physicians. When the Manual has not been adhered to, or when professional judgment substantially departs from accepted practice or standards, post-medication review is warranted to determine whether a showing for damages has been made. Because summary judgment was appropriate in this case, we decline to discuss the immunity question raised by appellant.

7. In nonemergency situations, failure to review an involuntary medication decision within 30 days as required under the Manual might very well establish a basis for damages in future

## DECISION

Affirmed as modified.

cases if the patient asserts such a claim in a timely fashion. Here, however, such a claim is moot when viewed in the context of the entire case.