# WILLA MAE PRICE, INDIVIDUALLY AND AS MOTHER AND NATURAL GUARDIAN OF DWIGHT PRICE, v. CHARLES G. SHEPPARD AND OTHERS.

239 N. W. 2d 905.

February 20, 1976—No. 45588.

*Berde, Leonard & Weinblatt* and *Alan W. Weinblatt*, for appellant.

*Warren Spannaus*, Attorney General, *Peter W. Sipkins*, Solicitor General, *Thomas L. Fabel*, Deputy Attorney General, and *Thomas H. Jensen*, Special Assistant Attorney General, for respondents.

*Benjamin S. Houge, Willard B. Crowley, Jr.*, and *Randall D. B. Tigue*, for Minnesota Civil Liberties Union, amicus curiae, seeking reversal.

YETKA, JUSTICE.

This appeal from a summary judgment entered in the Ramsey County District Court involves an action against the medical director of the Minnesota Security Hospital at St. Peter, Dr. Charles G. Sheppard, for (1) assault and battery, and (2) violation of plaintiff Dwight Price's civil rights under 42 USCA, § 1983.[1] The claims arise out of the administration of a series of 20 electroshock treatments, given against the express wishes of plaintiff Willa Mae Price, Dwight's mother and natural guard-

---

[1] 42 USCA, § 1983, provides as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Plaintiffs' complaint included two other claims, one for negligence in administering the electroshock treatments and one for the intentional infliction of mental distress to Mrs. Price; however, that part of the lower court's order relating to those claims is not challenged on appeal.

ian, while Dwight, a minor, was under involuntary commitment in the Minnesota Security Hospital at St. Peter.

Defendant's motion for summary judgment on Count I, alleging assault and battery, was granted March 22, 1974, based on the court's ruling that the defendant, acting in his official capacity, was immune from suit. Summary judgment was also granted on Count IV, alleging violation of Dwight's civil rights, on November 29, 1974. The court ruled that the electroshock treatments were neither cruel and unusual punishment under the Eighth Amendment of the United States Constitution, nor a violation of Dwight's right to privacy. We affirm.

Dwight Price was committed to the Hastings State Hospital September 8, 1971, by order of the Ramsey County Probate Court, which found Dwight to be "mentally ill-inebriate." The commitment petition was brought by Dwight's mother, Willa Mae Price, apparently in order to secure treatment for Dwight for a developing drug and alcohol problem. Several attempts at voluntary treatment, prior to the commitment proceedings, had proved unsuccessful.

Shortly after being admitted to Hastings, Dwight allegedly attempted to strangle one of the hospital staff. Because Hastings was not equipped to handle dangerous patients, Dwight was transferred to the Security Hospital at St. Peter on September 11, 1971.[2]

Dwight's condition, upon his admission at St. Peter, was diagnosed as simple schizophrenia. He was treated with tranquilizing and antidepressant medications, but apparently failed to respond and continued to be aggressive and assaultive to the staff and other patients. For this reason, Dr. Sheppard prescribed electroshock therapy.

He sought Mrs. Price's consent to administer the electroshock

---

[2] While the removal of the minor plaintiff from Hastings to St. Peter was later determined to be invalid by a review board at Hastings, that fact seems to be without any particular significance to the issues on appeal, and none is demonstrated by plaintiffs.

treatments. Through her attorney Mrs. Price arranged for an independent medical examination by Dr. William Chalgren,[3] a Mankato psychiatrist, for the purpose of determining the advisability of the proposed treatment. Dr. Chalgren examined Dwight November 27, 1971, and recommended that drug treatment continue but that if Dwight did not respond favorably, electroshock treatment be given.

Dr. Chalgren's recommendations were followed by the staff at St. Peter, but Dwight's condition did not improve. Accordingly, on December 22, 1971, without the consent of Mrs. Price, electroshock therapy began and was continued to February 11, 1972. Dwight was released from St. Peter June 19, 1972.

The issues raised on this appeal are:

(1)  Does the administration of electroshock therapy to an involuntarily committed minor patient of a state mental hospital, without the consent of the minor's guardian, violate his rights (a) to be free from cruel and unusual punishment, and (b) of privacy?

(2)  Is a state official entitled to immunity from an action for damages for acts performed by him in good faith and which he could not reasonably have known would violate the constitutional rights of another?

■ We do not agree with the claim that the electroshock therapy was cruel and unusual punishment for the reason that the record does not suggest, nor have plaintiffs demonstrated,

---

[3] Plaintiffs imply that Dr. Chalgren was less than candid with Mrs. Price in failing to disclose that he was, on occasion, a consultant to the St. Peter Security Hospital. Plaintiffs imply in their brief that her consultation with Dr. Chalgren was tainted, a conclusion we are not willing to draw. Beyond the bare fact that Dr. Chalgren was an occasional consultant to the Security Hospital, there is nothing to suggest collusiveness with hospital staff. On the contrary, the opposite is suggested from the fact that Dr. Chalgren recommended treatment which differed from that prescribed by the hospital, specifically that electroshock therapy be postponed, and that it be resorted to if other less serious forms of treatment failed.

how those treatments, under the circumstances of this case, can be regarded as "punishment." While plaintiffs are certainly correct in the statement that the characterization of electroshock therapy by defendant as "treatment" does not insulate it from Eighth Amendment scrutiny,[4] that alone does not establish that the treatments were "punishment."

The Supreme Court's decision in Trop v. Dulles, 356 U. S. 86, 78 S. Ct. 590, 2 L. ed. 2d 630 (1958), involving the question of whether a law which provided for loss of United States citizenship upon conviction of desertion from the military violated the Eighth Amendment, is instructive.

"* * * In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature. The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to

---

[4] Trop v. Dulles, 356 U. S. 86, 78 S. Ct. 590, 2 L. ed. 2d 630 (1958); Knecht v. Gillman, 488 F. 2d 1136 (8 Cir. 1973); Vann v. Scott, 467 F. 2d 1235 (7 Cir. 1972); Inmates of Boys' Training School v. Afflect, 346 F. Supp. 1354 (D. R. I. 1972).

regulate the franchise." 356 U. S. 96, 78 S. Ct. 595, 2 L. ed. 2d 639.

Applying the Trop rationale, if the electroshock treatments given the minor plaintiff served legitimate purpose rather than deterrence or reprimand, the Eighth Amendment claim must fail. Cf. Knecht v. Gillman, 488 F. 2d 1136, 1138 (8 Cir. 1973).

It is difficult to perceive, on the record before the court, how the electroshock therapy administered to the plaintiff could be regarded as anything but treatment. The purpose of Dwight's presence in the state's mental hospital system was not to reprimand him or deter him from certain behavior but rather for the treatment of his mental problems and developing chemical dependency. Moreover, the decision to administer electroshock therapy was not triggered by any single incident nor did it involve an isolated treatment, both of which would be more characteristic of punishment. Rather, the decision to administer a series of 20 treatments over a substantial period of time was made after other forms of treatment failed to show any curative effect on Dwight's condition, diagnosed as schizophrenia.

The circumstances of this case are simply unlike those presented in Knecht v. Gillman, *supra*. Inmates of the Iowa Security Medical Facility, confined there for examination, diagnosis, and treatment of mental disorders, for minor violations of hospital protocol, were given injections of a drug which caused the inmate to vomit for 15 minutes to an hour. Although characterized as aversive therapy, the apparent purpose of administering the drug in response to a violation of protocol was to reprimand the inmate.

In Inmates of Boys' Training School v. Afflect, 346 F. Supp. 1354 (D. R. I. 1972), also cited by plaintiffs in support of their claim, the retributive nature of the challenged conduct is even more clear. For committing infractions of the institution's rules, inmates of a juvenile corrections institution were isolated in cold, dark cells containing only a toilet and mattress. Finally, in Vann v. Scott, 467 F. 2d 1235 (7 Cir. 1972), cited by plaintiffs, the

court did not decide whether the incarceration of runaway juveniles was punishment but on the contrary indicated that under some circumstances, where it served the purpose of safeguarding the lives and welfare of juveniles, it would not be. Cf. Robinson v. California, 370 U. S. 660, 82 S. Ct. 1417, 8 L. ed. 2d 758 (1962).

Under the circumstances of this case, where electroshock therapy involving multiple treatments over a substantial period of time was prescribed for an involuntarily committed patient of a state mental hospital who had failed to respond to other forms of treatment, we hold that the administration of such electroshock treatments, absent the effective consent of the patient or his guardian, is not cruel or unusual punishment.

■ Plaintiffs second claimed violation of the minor's civil rights—the right of privacy—is more troublesome, primarily because that emerging right is currently so ill-defined. While its origins are said to date back to the late nineteenth century, its birth as an independent constitutional right, clearly denominated as such, is generally regarded as coming in Griswold v. Connecticut, 381 U. S. 479, 85 S. Ct. 1678, 14 L. ed. 2d 510 (1965), where the court overturned a statute prohibiting the use of contraceptives by married couples.

The right has since served as the basis of decisions striking down a Georgia statute prohibiting possession of obscene materials in one's home, Stanley v. Georgia, 394 U. S. 557, 89 S. Ct. 1243, 22 L. ed. 2d 542 (1969) ; extending the Griswold ruling to include unmarried individuals, Eisenstadt v. Baird, 405 U. S. 438, 92 S. Ct. 1029, 31 L. ed. 2d 349 (1972) ; and overturning a Texas statute prohibiting abortions, Roe v. Wade, 410 U. S. 113, 93 S. Ct. 705, 35 L. ed. 2d 147 (1973). The right remains, however, an extremely amorphous one.

We recognize that it is far too early in the evolution of the right of privacy to offer any single definition or rule of what the right entails. Only its broadest contours have been sketched. We do feel, however, because of the importance of that emerging

right, it is appropriate for us, at this time, to set forth more than our bare conclusion that the right of privacy is or is not involved.

At the core of the privacy decisions, in our judgment, is the concept of personal autonomy—the notion that the Constitution reserves to the individual, free of governmental intrusion, certain fundamental decisions about how he or she will conduct his or her life.[5] Like other constitutional rights, however, this right is not an absolute one and must give way to certain interests of the state, the balance turning on the impact of the decision on the life of the individual. As the impact increases, so must the importance of the state's interest. Some decisions, we assume, will be of little consequence to the individual and a showing of a legitimate state interest will justify its intrusion; other decisions, on the other hand, will be of such major consequence that only the most compelling state interest will justify the intrusion.

But once justified, the extent of the state's intrusion is not unlimited. It must also appear that the means utilized to serve the state's interest are necessary and reasonable, or, in other words, in light of alternative means, the least intrusive.[6]

---

[5] See, Henkin, *Privacy and Autonomy*, 74 Col. L. Rev. 1410; Note, On Privacy: Constitutional Protection for Personal Liberty, 48 N. Y. U. L. Rev. 670; Tribe, *The Supreme Court 1972 Term*, 87 Harv. L. Rev. 1.

[6] Roe v. Wade, 410 U. S. 113, 93 S. Ct. 705, 35 L. ed. 2d 147 (1973), aptly illustrates the balancing process. The decision involved was whether to terminate a pregnancy, a decision the state had completely assumed by prohibiting abortion. Step one for the court was assessing the impact of the decision on the life of the individual.

"* * * The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed mother-

To summarize, our understanding of at least one aspect of the privacy decisions to date is that where the state proposes to intrude into a fundamental decision affecting the conduct of an individual's life, in order to justify that intrusion, it must first demonstrate a legitimate and important state interest. The sufficiency of the interest will be directly dependent on the impact of the decision on the individual's life. And secondly, the means it intends to utilize in serving that interest must, in light of the alternatives, be the least intrusive.

The question in the case before us is whether the state, consistent with Dwight Price's right of privacy, can assume the decision of whether Dwight, an involuntarily committed mental patient, will undergo psychiatric treatment. We observe that the more fundamental decision, whether he was to undergo hospitalization, was assumed by the state at the commitment proceeding, the validity of which is not contested.

The impact of the decision on the individual is unquestionably great, for the result is the alteration of the patient's personality. The state's interest in assuming the decision is in act-

---

hood may be involved." Roe v. Wade, 410 U. S. 153, 93 S. Ct. 727, 35 L. ed. 2d 177. The court concluded that the decision was of such fundamental importance and impact that only a compelling state interest could justify the state's intrusion.

The state advanced two interests: (1) the preservation and protection of the health of the pregnant woman, and (2) the protection of prenatal life. Recognizing both as legitimate state interests, the court nevertheless concluded that in the early stages of pregnancy neither one was "compelling." However, as the pregnancy progressed those interests became compelling, the first at the stage when the mortality rate in abortion surpassed that in childbirth, and the second when the fetus became viable.

In determining the necessity and reasonableness of the alternative means of serving the state's interest in the health of the mother—regulation of the abortion procedure or prohibition of abortion—the court settled on the former being the least intrusive means that adequately served the state's interest, Obviously there were no alternatives to protect prenatal life.

ing as *parens patriae,* fulfilling its duty to protect the well-being of its citizens who are incapable of so acting for themselves. Under the circumstances of this case, that interest can be articulated as the need for the state to assume the decision-making role regarding the psychiatric treatment for one who, presumptively, based on the fact of commitment on the ground of mental illness,[7] is unable to *rationally* do so for himself. If that interest of the state is sufficiently important to deprive an individual of his physical liberty, it would seem to follow that it would be sufficiently important for the state to assume the treatment decision. We hold that it is.

"Under the *parens patriae* rationale, an individual may be committed when he lacks capacity to make a rational decision concerning hospitalization, and the treatment or custodial care available would be beneficial enough to outweigh the deprivations which commitment would impose on him. Inherent in an adjudication that an individual should be committed under the state's *parens patriae* power is the decision that he can be forced to accept the treatments found to be in his best interest; it would be incongruous if an individual who lacks capacity to make a treatment decision could frustrate the very justification for the state's action by refusing such treatments." Note, *Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv. L. Rev. 1190, 1344 (1974).

The more important question, we believe, involved in the state's assumption of the treatment decision is the necessity and reasonableness of the means utilized by the state in treating an

---

[7] While Minn. St. 253A.18, subd. 1, provides that "[c]ommitment * * * is not a judicial determination of legal incompetency," a finding that a person is mentally ill, one of the grounds for commitment, requires evidence that "clearly shows that his customary self-control, judgment, and discretion in the conduct of his affairs [including medical care] is lessened to such an extent that hospitalization is necessary for his own welfare or the protection of society * * *." Minn. St. 253A.07, subd. 17(a).

involuntarily committed patient. The techniques generally available to treat psychological disorders range in degree of severity and coerciveness from the least intrusive forms such as milieu therapy (behavior changes produced by manipulation of the patient's environment) and psychoanalysis, to drug, aversion, or electroconvulsive therapy, and ultimately to psychosurgery. Some of these techniques require the voluntary participation of the patient in order to be effective, while others can be effective when involuntarily imposed. As the techniques increase in severity, so do the risks of serious and long-lasting psychological or neurological damage.[8]

Whether the administration of electroshock treatments, one of the most intrusive forms of treatment, was necessary and reasonable in the treatment of Dwight Price is a question we cannot reach. We believe, and so hold, that whatever the answer to that question may be, on the record before us the defendant is immune from liability under 42 USCA, § 1983.[9]

---

[8] Note, 45 So. Cal. L. Rev. 616, 621 to 633.

[9] We also believe that defendant is protected from liability for assault and battery because, while the electroshock therapy here was performed without the consent of the minor patient's guardian, defendant was privileged to institute such therapy as part of his duty to provide care to an involuntarily committed, mentally ill patient. See, Minn. St. 253A.02, subd. 9. In Campbell v. Glenwood Hills Hospitals, Inc. 273 Minn. 525, 536, 142 N. W. 2d 255, 262 (1966), we alluded to the duty of care owed involuntarily committed patients by the state and refused there to find the defendant doctors liable for a battery arising out of a course of treatment "determined and effected by competent institutional doctors who would have been at fault if they had not attempted to help plaintiff." Similarly, the institutional doctor's privilege to pursue reasonable lines of therapy in good faith in conformance with existing procedures authorizing treatment after a commitment order protects the defendant doctor from tort liability in the instant case. In the future, of course, institutional doctors must comply with the new procedures set forth in this opinion for authorizing more severe forms of therapy, e.g., electroshock therapy, in order to remain protected by this privilege from tort liability.

The Supreme Court has recently considered the qualified immunity possessed by state officials acting in their official capacity, O'Connor v. Donaldson, 422 U. S. 563, 95 S. Ct. 2486, 45 L. ed. 2d 396 (1975); Wood v. Strickland, 420 U. S. 308, 95 S. Ct. 992, 43 L. ed. 2d 214 (1975); Scheuer v. Rhodes, 416 U. S. 232, 94 S. Ct. 1683, 40 L. ed. 2d 90 (1974). In O'Connor, the court summarized the nature of that immunity:

"* * * [T]he relevant question for the jury is whether [the state official] 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the plaintiff].' * * * [Wood v. Strickland, 420 U. S. 322, 95 S. Ct. 1001, 43 L. ed. 2d 225.] For purposes of this question, an official has, of course, no duty to anticipate unforeseeable constitutional developments." [Citations omitted.]

It seems abundantly clear, given the vagueness of the constitutional right of privacy, that the defendant could not reasonably have known that the administration of electroshock treatments to Dwight Price violated a "clearly established" constitutional right. Wood v. Strickland, 420 U. S. 322, 95 S. Ct. 1001, 43 L. ed. 2d 225.

Moreover, it is evident from the record that the defendant acted without malice and in good faith. Less intrusive means of treatment were employed by the defendant for a period of 3 months without success. Dwight continued to be assaultive and for that reason required confinement to his room most of the time, a circumstance which the defendant believed was a substantial obstacle to recovery and which could be corrected by electroshock. He followed the recommendation of the plaintiff's own doctor and continued the less intrusive forms of treatment for a further period before commencing the electroshock treatments. Proper medical procedures were followed in administering the treatments, and their administration did not contravene any

state statute or regulation. In short, measured by accepted conduct at that time, the defendant's actions were proper.

Because the potential impact of the more intrusive forms of treatment is so great, we are reluctant in those cases where the patient or guardian refuse their consent, to leave the imposition of the more intrusive forms of treatment solely within the discretion of medical personnel at our state hospitals. For that reason, we adopt the following procedure for future cases:

(1) If the patient is incompetent to give consent or refuses consent or his guardian, other than persons responsible for his commitment also refuses his consent, before more intrusive forms of treatment may be utilized, the medical director of the state hospital must petition the probate division of the county court in the county in which the hospital is located for an order authorizing the prescribed treatment; [10]

(2) the court shall appoint a guardian ad litem to represent the interests of the patient; [11]

(3) in an adversary proceeding, pursuant to the petition, the court shall determine the necessity and reasonableness of the prescribed treatment.

In making that determination the court should balance the patient's need for treatment against the intrusiveness of the prescribed treatment. Factors which should be considered are (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4)

---

[10] It is recommended, for purposes of economy, that the necessity and reasonableness of more intrusive forms of treatment be considered at the commitment hearing. This would, of course, depend on a sufficiently extensive diagnosis and history of the patient's disorder, and should not become merely a matter of form. Also, for economy, if the committing court is reasonably convenient to the state hospital, it would be desirable to return to it since it would be already familiar with the case, having previously appointed a guardian ad litem for the patient.

[11] Those considered for appointment as guardian ad litem should not include those responsible for the patient's commitment.

its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.[12]

We cannot draw a clear line between the more intrusive forms of treatment requiring this procedural hearing and those which do not. Certainly this procedure is not intended to apply to the use of mild tranquilizers or those therapies requiring the co-operation of the patient. On the other hand, given current medical practice, this procedure must be followed where psycho-surgery or electroshock therapy is proposed.

Affirmed.

---

[12] Note, 45 So. Cal. L. Rev. 616, 658; Note, Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1347; Kaimowitz v. Michigan Dept. of Mental Health (summarized in 42 U. S. L. W. 2063, July 31, 1973).