**In the Matter of Joanne KOLODRUBETZ.**

**No. CX–87–1177.**

Court of Appeals of Minnesota.

Sept. 1, 1987.

Review Denied Nov. 6, 1987.

Thomas Bennett Wilson, III, Gayle Gaumer, Wilson Law Firm, Edina, for appellant Kolodrubetz.

Hubert H. Humphrey, III, Atty. Gen., Kathy Meade Hebert, Sp. Asst. Atty. Gen., St. Paul, for respondent Com'r of Human Services.

Considered and decided by POPOVICH, C.J., and FOLEY and HUSPENI, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Appellant Joanne Kolodrubetz petitioned the committing court for an order (a) requiring the Commissioner of Human Services to respond to recommendations by the Anoka Metro Regional Treatment Center (AMRTC) Review Board regarding treatment of appellant at that facility, (b) requiring AMRTC to establish specific discharge criteria, transfer her to an open unit, and allow her to change physicians, and (c) requiring the Commissioner "to place appellant in the least restrictive, most effective program available in the State of Minnesota or in the United States, to facilitate treatment of [her] mental illness * * *."

After a hearing, the trial court denied relief, concluding that review board recommendations on treatment are advisory only and the Commissioner's failure to implement them in this case was not arbitrary and capricious. The patient appealed. We reverse, finding the petition was an inappropriate remedy to challenge treatment decisions, but agree that those decisions did not depart from accepted professional judgment, practice, or standards.

## FACTS

Joanne Kolodrubetz has suffered from anorexia nervosa for more than a decade. She has been treated in numerous facilities without success. She has frequently left treatment against medical advice. Even when she has met discharge criteria, such as achieving specific weight goals, she has always deteriorated quickly upon release.

Kolodrubetz was committed to AMRTC on April 14, 1986. She then weighed 73 pounds. She left the hospital almost immediately and was eventually discovered in a Washington, D.C. hospital psychiatric ward. By the time she was admitted there, Kolodrubetz had lost 20 pounds and was near death. She returned to Minnesota and AMRTC in August 1986, after her condition stabilized. Treating psychiatrist Thomas Folsom of AMRTC evaluated Kolodrubetz and noted that years of behavioral therapy for anorexia nervosa had been unsuccessful and "a very pathologic pattern" of repeated admissions had been established. He recommended prolonged hospitalization at AMRTC and psychotherapy with the "avoidance of all power struggles whenever possible." On October 17, 1986 Kolodrubetz was again committed to AMRTC as a mentally ill person.

Kolodrubetz increased her weight to about 70 pounds. However, Kolodrubetz resisted psychotherapy, claiming that her attorney would obtain her release from AMRTC. Dr. Folsom wrote to the committing court in November 1986, warning that the pattern of Kolodrubetz "running away from treatment prior to completion" was continuing. A written treatment report, submitted to the court in December 1986, indicated that provisional discharge to a structured facility was anticipated after Kolodrubetz gained insight into her condition and demonstrated the ability to maintain herself outside AMRTC. To achieve that goal, psychotherapy was recommended, although Kolodrubetz continued to refuse treatment.

On December 4, 1986, Kolodrubetz appeared before the AMRTC Review Board, requesting release. Kolodrubetz complained that she had not been transferred to a facility offering specialized programs for anorexic patients. The Board acknowledged that Kolodrubetz was viewed as a high risk for escape, but questioned what she was expected to do to obtain a transfer to an open, unlocked unit or a discharge from the hospital. Counsel for Kolodrubetz demanded that the Commissioner of

Human Services "immediately respond" to the Board's report.

On December 30 Dr. Myron Malecha, the Medical Director of AMRTC, wrote to the Commissioner in response to the review board's findings. He explained that Kolodrubetz had failed "in approximately ten or more" treatment settings and had "been able to effectively avoid treatment by precipitously leaving settings to which she had been voluntarily admitted or by going AWOL from facilities to which she had been committed." Malecha explained that the patient's weight had increased and her life was no longer in imminent danger, and this improvement had been accomplished at Anoka without the forced tube feeding used by other facilities. By avoiding "power struggles over weight, [and] by psychotherapeutically approaching" the problem, Malecha asserted the "treatment has been effective although it has not been rapid."

Dr. Malecha warned that the mortality rate for anorexic patients is 35 percent and urged that the risks of an abrupt transfer to a behavior oriented program be weighed against the progress already shown by the patient's weight gain and maintenance. He concluded that Kolodrubetz's demands for specific changes could be "a focal issue for manipulation and avoidance of treatment" and recommended that no changes be made.

The Commissioner of Human Services wrote to Kolodrubetz's counsel in early January, explaining that a meeting was being scheduled between the Review Board and Dr. Malecha to address the Board's concerns. If the issues were not resolved, the Commissioner expressed her willingness to involve the Department further.

On January 15, 1987 the Review Board wrote to Dr. Malecha, again complaining that specific criteria had not been set for transferring Kolodrubetz from a locked ward or to another facility. On March 3 the Board wrote to the Commissioner, expressing frustration that its recommendations had not been implemented.

The Medical Director of AMRTC wrote a lengthy letter to the Assistant Commissioner of Human Services on March 12. Dr.

Malecha explained that anorexia involves aberrant behavior directed toward weight loss, including refusal to eat with others. By focusing attention on the lack of eating and extreme weight loss, the patient exerts control over their environment. Severe physical problems, including low potassium levels and cardiac arrythmia may become life-threatening. Other disturbances of bodily functions are common, such as cessation of menstrual cycles, low temperature and blood pressure, and abnormal endrocrine and hormone levels. Anorexic patients are often compulsive perfectionists and high achievers until the severity of their illness limits their physical ability.

Treatment for anorexia nervosa is generally oriented toward behavior change. Programs often link privileges to specific weight gain. It is common for anorexic patients to try to manipulate such behavioral (objectively measured) criteria by drinking large amounts of water before they are weighed. In fact, Dr. Malecha said, a characteristic feature of anorexics is their ability to manipulate treatment systems and divide opinion. As a result, conflict is a constant feature of their treatment. Patients "work very hard at finding the rules and criteria which are set up for their privileges, release or discharge. Once they have identified those rules, every effort is focused toward finding flaws in those rules. * * * The focus of treatment becomes not the patient but the rules of the facility."

When psychotherapy is employed in treating anorexia, it focuses on patient awareness of the illness, fear of failure and independence, and acceptance of adult responsibilities. AMRTC chose to work to avoid power struggles between staff and Kolodrubetz. Malecha explained that, as expected, Kolodrubetz had challenged her treatment program through all available avenues. However, Kolodrubetz's weight had not become the focus of the struggles, as it had in the past, and her health had gradually improved.

Dr. Malecha described the opinion of an outside psychiatrist consulted for his opinion on the case. He concluded that Kolo-

drubetz had focused her efforts at "undercutting treatment" and could not be effectively treated until "her escape routes [are] closed off" and she understands that she will not be able to avoid treatment. Dr. Malecha believed that continuing criticism of treatment efforts had perpetuated Kolodrubetz's resistance and manipulative efforts.

On March 13, 1987 Kolodrubetz's attorney petitioned the committing court for an order requiring (a) a response to the Review Board's findings, (b) adoption of specific discharge criteria, (c) transfer to an open unit, (d) assignment of a new physician, and (e) placement in a less restrictive facility. The petition was brought pursuant to Minn.Stat. § 253B.17, subd. 1. A hearing was held on March 31.

Kolodrubetz's counsel framed the issue before the committing court as the extent of the Review Board's authority to determine a specific patient's treatment.

Dr. Malecha explained the basis for the AMRTC decision to employ psychotherapy instead of a behavioral approach. He recognized that Kolodrubetz's need to completely control her environment, including treatment, was part of the disease of anorexia nervosa. Despite the difference of opinion with the Review Board concerning Kolodrubetz's treatment, Malecha believed the chosen treatment was yielding some progress.

The court-appointed examiner was Dr. Roger Sweet, a licensed consulting psychologist. He confirmed that the usual approach to treating eating disorders was behavioral, but Kolodrubetz had not done well in such programs in the past. Sweet testified that Dr. Malecha's choice of a psychodynamic-psychotherapeutic approach was within accepted professional standards. Sweet believed that objectively measurable criteria could still be formulated for the chosen approach.

John Lund, a Hennepin County social worker assigned to Kolodrubetz for two years, was familiar with her lack of progress in past programs. He had been unable to find an appropriate community setting for Kolodrubetz and believed she had shown improvement since her commitment to AMRTC. Lund agreed that Kolodrubetz should be kept in a locked unit.

Kathy Hannan, a registered nurse assigned to Kolodrubetz at AMRTC, confirmed that Kolodrubetz had gained weight without force feeding and had become more outgoing. She testified Kolodrubetz had left Anoka in April 1986 the second time she was allowed to leave the locked unit for a therapy group.

Dr. Thomas Folsom, the board certified psychiatrist assigned to Kolodrubetz, also testified at the hearing. He first met Kolodrubetz in 1983 when she was a patient at the University of Minnesota. By contrast to the rigid behavioral programs in which Kolodrubetz had been unsuccessful, Folsom testified the only control AMRTC had imposed on her was to stop her from running away from the hospital. He confirmed that a behavioral approach to Kolodrubetz's illness was contraindicated because of repeated failures and power struggles. Folsom believed Kolodrubetz's power struggles at AMRTC had been largely confined to him.

Although improvements had been made, Dr. Folsom was concerned that Kolodrubetz would withdraw from therapy again following his testimony in court if she perceived that there was an alternative to continuing to work with him. He resisted setting specific criteria for transfer to a different unit for fear Kolodrubetz would perform as needed and then leave without authorization and without making any real change. Dr. Folsom stressed that the "stakes" were extremely high, given proof that Kolodrubetz loses one half pound daily outside a treatment facility and quickly deteriorates until emergency care is needed to save her life.

Following the hearing, Kolodrubetz refused to eat or interact with others. She lost weight quickly and was eventually transferred to the emergency room of a nearby hospital. When her condition stabilized she was returned to AMRTC.

On May 12 the trial court denied Kolodrubetz's petition for release. The court

concluded that due process required patients be afforded some type of judicial review of the Commissioner's response, or lack thereof, to review board findings on treatment. The trial court applied a standard of review applicable to judicial review of agency decisions. The incorporated memorandum noted that AMRTC had substantial reasons for its treatment decisions and concluded that review board findings are advisory, while the appropriate treatment in a particular case is for the treating facility to determine.

This appeal was filed on June 15. On July 7 Joanne Kolodrubetz went on a group outing to a miniature golf course. She escaped and has not returned to AMRTC.

## ISSUES

1. Is the committing court authorized by Minn.Stat. § 253B.17, subd. 1 to review the propriety of treatment decisions?

2. Are the treatment decisions made in this case within accepted professional standards?

## ANALYSIS

1. The first issue in this case focuses on who has the final responsibility for treatment decisions involving committed persons. The Commitment Act, recent decisions of this court, and decisions by the United States Supreme Court all offer guidance.

### (a) *Hospital Review Boards*

The head of each treatment facility is directly responsible for the care and treatment programs within that facility. Minn. Stat. § 253B.02, subd. 8 (1986). The Commissioner of Human Services is charged with monitoring the process of determining and reviewing the appropriate treatment for all committed persons. Minn.Stat. § 253B.03, subd. 7. To assist in this monitoring, the legislature directed the Commissioner to establish review boards for each regional center (formerly called state hospitals). The boards must include at least one attorney and one person "qualified in the diagnosis of mental illness, mental retardation, or chemical dependency * * *."

Minn.Stat. § 253B.22, subd. 1. Patients at the facilities have the right to appear before the board and must be notified of that right. *Id.*, subds. 2 & 3.

Each board must "review the admission and retention of patients" and may also examine a specific patient's records if there is a "reasonable doubt as to continued need of confinement in a treatment facility." *Id.*, subd. 4. The boards may "receive reports from patients, interested persons, and treatment facility employees, and investigate conditions affecting the care of patients." *Id.* "The review board shall report its findings to the commissioner and to the head of the treatment facility." *Id.*

The duties of the review boards are broadly defined, but the statute does not confer upon the boards any power to implement their "findings." Kolodrubetz argued in the trial court that the statutory requirement that the boards "report" to the Commissioner and the head of the treatment facility implies that a review board may overrule treatment decisions, or, at the very least, that the Commissioner and facility must somehow "respond" to review board findings.

First, we note that the Commissioner and medical director of AMRTC did respond to the Review Board's concerns in this case. Voluminous correspondence in the file details the basis for the treatment decisions. Consultations with outside experts confirmed the appropriateness of those decisions. Meetings were scheduled with the Review Board to answer their questions. None of these actions are mandated by the Commitment Act, but we applaud the willingness of the treating professionals to subject their decisions to scrutiny to insure that the patient's interests are served.

Nothing in the statute supports Kolodrubetz's contention that review board findings on treatment issues *must* be implemented. "In general, the hospital review boards have no decision-making authority, but are limited to making recommendations to the commissioner and the head of the treatment facility." E. Janus, *Civil Commitment in Minnesota* 182 (1986).

We recently considered the responsibility for treatment decisions in the narrower context of involuntary administration of neuroleptic medications. *See Jarvis v. Levine,* 403 N.W.2d 298 (Minn.Ct.App.1987), *pet. for rev. granted,* (Minn. July 2, 1987). An administrative policy, adopted by the Department of Public Welfare (now the Department of Human Services) in 1981, requires the patient's treatment team to evaluate any proposal to utilize forced medication, a physician to certify the need for involuntary treatment, and a treatment review panel to approve or disapprove the medication, with a right of appeal to the facility medical director, who makes the final decision. *See Jarvis,* 403 N.W.2d at 301–02. The hospital review board may review the procedural posture of the medication decision and make recommendations and suggestions concerning the case. *Id.* at 302.

In *Jarvis,* the treatment review panel disapproved medication and the hospital review board agreed with the treatment review panel. When a new request was made by the patient's treating physician and the treatment review panel again disapproved the treatment, an appeal was made to the facility medical director, who overruled the treatment review panel and approved involuntary medication. *Id.* at 302–03. Although the hospital review board disapproved of the decision to administer involuntary medication, the policy explicitly vested the medical director with the final decision.

■ By agreeing with the trial court that review board recommendations are advisory only, we do not mean to imply that recommendations of the review boards on treatment decisions can be disregarded with impunity. The boards are an integral part of the statutory scheme for monitoring patient treatment, but the Commissioner and head of the treatment facility have the final responsibility. Disregard for the boards' concerns may be relevant to judicial inquiry into the reasonableness of treatment decisions, and we discuss that next.

(b) *Judicial Review*

If the review board has the duty to evaluate patient care and treatment and the statute imposes no obligation on the Commissioner or medical director of the treating facility to implement review board findings and recommendations, how may a patient obtain meaningful review of treatment decision?

The committing court, without commenting on the propriety of the remedy, entertained the issue in this case on a petition brought pursuant to Minn.Stat. § 253B.17, subd. 1. The statute provides that committed patients and interested persons

> may petition the committing court * * * for an order that the patient is not in need of continued institutionalization or for an order that an individual is no longer mentally ill, mentally retarded, or chemically dependent, or for any other relief as the court deems just and equitable.

*Id.* Kolodrubetz did not assert that she should be released from her commitment for any reason and has not challenged the determination that she is mentally ill. Instead, Kolodrubetz bases her claim that the committing court may review treatment decisions on the language permitting a petition to request "other relief."

This court has repeatedly stressed that the committing courts may not involve themselves in treatment decisions. *See, e.g., In re Wicks,* 364 N.W.2d 844, 847 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. May 31, 1985) (monitoring of treatment program for mentally retarded patients not a function of the committing court). The United States Supreme Court has emphasized that "interference by the * * * judiciary with the internal operations of [state] institutions should be minimized." *Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982).

Despite the general deference to medical personnel to make treatment decisions, Minnesota has expressed its reluctance to confer unbridled discretion upon the medical personnel at state hospitals in the area of very intrusive forms of treatment, such as electroconvulsive therapy (formerly

called electroshock treatment). *See Price v. Sheppard,* 307 Minn. 250, 253–54, 239 N.W.2d 905, 908 (1976). However, the court in *Price* specifically held that the procedure it established for seeking a court order authorizing intrusive treatment "is not intended to apply to the use of mild tranquilizers or those therapies requiring the cooperation of the patient." *Id.* at 263, 239 N.W.2d at 913. In this case, the treatment chosen for Kolodrubetz is psychotherapy, which consists of conversations with her psychiatrist. The supreme court characterized psychoanalysis and manipulation of the patient's environment as the least coercive and intrusive forms of treatment. *Id.* at 260, 239 N.W.2d at 911.

Neither the statute, nor the opinions of the courts of this state and the United States Supreme Court, authorize the committing court to monitor specific treatment decisions short of electroconvulsive therapy. The difference of opinion regarding Kolodrubetz reflects, in many ways, the split of opinion within the psychiatric community between so-called behavioralists and psychoanalysts. This difference of opinion as to treatment methods has not been resolved by mental health professionals, and it cannot be resolved by the courts. *See Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3rd Cir.1980) (Sietz, J., concurring) ("It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.").

■ Our continuing conviction that committing courts should not be the final arbiters for differences of opinion concerning treatment decisions does not, however, deprive the patient of a right to treatment. We are aware that the United States Supreme Court has stopped short of holding that committed persons have a general constitutional right to training and treatment, and has instead held that due process requires only such "minimally adequate or reasonable training" to protect the patient's liberty interests in safe conditions of confinement and freedom from unreason-

able bodily restraints. *Youngberg,* 457 U.S. at 318–20, 102 S.Ct. at 2459–60.

However, in Minnesota, patients have a statutory right to

receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further custody, institutionalization, or other services unnecessary.

Minn.Stat. § 253B.03, subd. 7. The committed person does *not* have the right to determine the treatment for their mental illness, mental retardation, or chemical dependency. *Id.,* subd. 6.

■ "The Commitment Act clearly places decisions as to treatment of involuntarily committed mentally ill patients in the hands of mental health professionals." *Jarvis,* 403 N.W.2d at 309 (citations omitted). As we held in *Jarvis,* the patient is not entitled to direct judicial review of treatment decisions. If a treatment decision "substantially departs from accepted 'professional judgment, practice or standards' in nonemergency cases, an institutionalized mental patient might have a claim for damages." *Id.* at 310 (quoting *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462). Indeed, each of the relevant cases was initially brought as an action for damages under 42 U.S.C. § 1983. *See Youngberg,* 457 U.S. at 309, 102 S.Ct. at 2454; *Price,* 307 Minn. at 251, 239 N.W.2d at 907; *Jarvis,* 403 N.W.2d at 299. Review board findings and recommendations may be relevant to an inquiry on whether a treatment decision departed from the professional judgment standard applicable in such an action.

■ 2. Although Kolodrubetz did not bring an action for damages and the trial court did not apply the professional judgment standard announced in *Youngberg* and adopted by this court in *Jarvis,* the record is clear that no action for damages would lie in this case. It is undisputed that the treatment decisions were the result of professional judgment. The choice to employ psychotherapy where behavioral approaches have failed repeatedly is, according to the testimony presented to the trial court, within accepted professional stan-

dards. Kolodrubetz introduced no evidence to the contrary and subsequent events, including her rapid deterioration after the hearing and her escape, have tragically proven the advisability of that choice.

## DECISION

█ The committing court should not have reviewed the treatment recommendations of the AMRTC Review Board or the Commissioner's response (or lack thereof) on a petition brought pursuant to Minn. Stat. § 253B.17, subd. 1. Treatment decisions may be challenged by the patient before the review board and by a suit for damages pursuant to 42 U.S.C. § 1983 after administrative remedies have been exhausted. The record in this case indicates that treatment decisions did not depart from accepted professional judgment, practice, or standards, and they resulted from the exercise of professional judgment by mental health professionals charged with meeting the right of a committed mentally ill person to treatment.

Reversed.