*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-0067**

In the Matter of the Civil Commitment of: Leah Christina Graeber.

**Filed June 10, 2024**
**Affirmed**
**Schmidt, Judge**

Dakota County District Court
File No. 19HA-PR-11-157

Jennifer L. Thon, Jonathon M. Comuzzi, Jones Law Office, Mankato, Minnesota (for appellant Leah Christina Graeber)

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Jessica A. Bierwerth, Assistant County Attorney, Hastings, Minnesota (for respondent Dakota County Social Services)

Considered and decided by Worke, Presiding Judge; Schmidt, Judge; and Florey, Judge.*

**NONPRECEDENTIAL OPINION**

**SCHMIDT**, Judge

Appellant Leah Christina Graeber was committed to the Minnesota Commissioner of Human Services as a person who is dangerous and who poses a risk of harm due to mental illness. To advance appellant's treatment—which has stagnated—a licensed psychiatrist at Minnesota Security Hospital sought authorization to treat appellant with

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

electroconvulsive therapy (ECT), which respondent Dakota County Social Services (the county) supported, and appellant opposed. After an evidentiary hearing, the district court granted the petition to authorize ECT. On appeal, appellant argues that the record does not support the district court's determination that ECT is reasonable and necessary. Because the court considered the relevant factors in finding that ECT was reasonable and necessary for appellant, and the record supports the district court's findings, we affirm.

## FACTS

*Initial commitment and subsequent treatment.*

Appellant was initially committed to the commissioner of human services in 2011. The commitment stemmed from a 2010 incident in which appellant drove a car over 100 miles per hour, lost control, and struck an oncoming vehicle. The crash killed an 11-year-old boy and injured his parents and sister. Appellant reported she felt safe driving at that speed because she was God. In subsequent interviews, appellant claimed the 11-year-old boy was not dead. Her commitment was finalized, and became indeterminate, in 2012.

Doctors have diagnosed appellant with schizoaffective disorder, bipolar type, and controlled-substance disorders. She has been treated with neuroleptic medications and medications to assist with mood stability. After significant treatment, appellant has earned most privileges that can be granted to patients. Appellant also maintains part-time employment in the hospital. She is neither aggressive nor an imminent danger to herself.

Yet, despite being on "robust doses of neuroleptic medications," appellant continues to have "refractory psychotic and mood symptoms" that "prevent her from moving forward in treatment to a less restrictive setting." Appellant has never had any previous ECT.

2

***The petition for ECT and first examiner's recommendation to perform ECT.***

In 2023, a licensed psychiatrist at the hospital petitioned for the authorization to administer ECT to appellant. The psychiatrist noted that appellant's "refractory symptoms are preventing her from moving forward in treatment to a less restrictive setting," and "[a]fter exhausting the different psychotropic medication treatment modalities in addition to therapy, ECT remains the least restrictive treatment for [appellant] at this time." The proposed treatment constituted an acute phase of three times per week for a maximum of 30 treatments. If successful, the proposed treatment would move to a maintenance phase, consisting of two or fewer treatments per week for the duration of appellant's commitment.

Prior to a hearing on the petition, the court received a report from a court-appointed examiner. In his report, the examiner noted that "[m]ultiple records indicate that when [appellant] is not medication compliant she quickly and 'profoundly' decompensates." The examiner concluded that ECT was both reasonable and necessary. He also opined that appellant does not have the capacity to make a competent decision regarding ECT because she could not "express a clear choice that was not based on delusional thoughts."

***The second court-appointed examiner also recommended ECT.***

At appellant's request, the district court appointed a second examiner. The second examiner opined that appellant "remained psychotic and delusional in September 2023" and that appellant "demonstrated a poor understanding and was uncooperative," when a psychiatrist attempted to discuss ECT with her. The examiner reiterated that appellant was actively psychotic, persistently delusional, in extreme denial, and that "[p]harmacologic management has been extensively tried and the reasonable possibilities exhausted."

The examiner noted that "[i]t was virtually impossible to break through [appellant's] delusional grandiosity" and that appellant's insight is "extremely poor, and her denial is extreme." Additionally, the examiner noted that appellant's judgment "is often just as impaired, specifically in the area of treatment need and self-care."

The examiner discussed the general necessity and reasonableness of ECT before analyzing the six specific factors articulated by the Minnesota Supreme Court[1] for courts to consider in determining the necessity and reasonableness of a proposed treatment. The examiner opined that appellant meets the criteria for the administration of ECT.

The examiner acknowledged that with ECT, "the most optimistic outcome is, in general, slightly less than 50% of patients will see slightly less than 50% symptom improvement." However, the examiner continued, "[g]iven that this combination of treatment modalities is reserved for the most seriously mentally ill, even that somewhat lackluster statistical response is well worth it for those patients who do respond." The examiner concluded that appellant has been receiving treatment for over ten years and "is still severely symptomatic and mentally ill, and . . . [w]ithout this combination of aggressive treatment, there appears to be no realistic hope that [appellant] can ever be safely released to the community."

---

[1] In *Price v. Sheppard*, the Minnesota Supreme Court articulated six factors for courts to consider in determining the necessity and reasonableness of a proposed treatment. 239 N.W.2d 905, 913 (Minn. 1976).

Despite her recommendation of ECT, the examiner included a caveat related to the difficulties presented by the particular facts of this case. The examiner noted that the majority of cases that use ECT involve a patient who "is at serious risk of physical illness without ECT, due to immobility and/or inadequate fluid or food intake; or in the alternative, the patient is so suicidal or aggressive that he is a danger to himself or others." The examiner noted that appellant is not aggressive, an imminent danger to herself, or in physical danger from her symptoms. Nonetheless, the examiner recognized that appellant has not adequately responded to "less intrusive forms of treatment."

While appellant is "adamantly against ECT," the examiner explained that appellant's "reasons for refusing ECT are based on delusion" and she is not able to make a "rational . . . decision that she would prefer to remain hospitalized in order to avoid ECT." From a medical standpoint, the examiner concluded that ECT is "virtually the only option available that can be hoped to provide at least a moderate degree of improvement and may offer the potential ability to move forward in treatment."

***The district court ordered ECT.***

At an October 2023 hearing, the district court received the examiner reports and heard testimony that ECT is reasonable and necessary. The second examiner testified that appellant "has gone as far as she can go with neuroleptic medications," and that healthcare professionals are "really at a fork in the road and the end of the line with [appellant]." The second examiner reiterated that appellant "is quite clearly at the point where a combination of Clozaril and ECT is essentially the only thing left for her." On cross-examination, the second examiner acknowledged that appellant is not the typical patient for ECT.

5

Appellant testified at the hearing about her current setting, including her work, outings, and treatment. Appellant testified that she is not delusional and that "doctors want to make [her] look bad and libel and slander everything they can against [her] just to make [her] suffer [because] they can't stand what [she] believes in."

In its findings of fact, conclusions of law, and order authorizing the administration of ECT, the district court found that appellant's "symptoms have persisted despite robust doses of neuroleptic medication and [the symptoms] are preventing her from moving forward in treatment." The district court noted that each examiner determined that ECT was necessary and reasonable for appellant.

The district court found appellant was articulate, intelligent, and able to express her feelings and opinions, including that she was opposed to ECT. But the district court determined that the second examiner "credibly testified that [appellant] is without the capacity to determine for herself whether the proposed treatment is necessary or desirable as she lacks insight into her mental illness and therefore cannot rationally weigh the risks and benefits involved with such treatment." Acknowledging that the benefits of ECT are not "robust," and appellant is "independent in terms of her activities of daily living," the district court gave "great weigh[t]" to the second examiner's opinion that "even [the] somewhat lackluster statistical response is well worth it for those patients who do respond." The court also credited the examiner's opinion that health professionals are "largely at the end of the road in terms of what to offer [appellant]" and "[w]ithout this combination of aggressive treatment, there appears to be no realistic hope that [appellant] can ever be safely released to the community."

The district court made findings for each *Price* factor and determined that ECT is necessary and in appellant's best interests. The court held that appellant's "clinical condition has failed to adequately respond to less intrusive treatment modalities. Although exact efficacy is uncertain, ECT will likely improve [appellant's] mental status which may improve her likelihood of getting an order to leave the hospital." After "carefully considering" the *Price* factors, the district court found clear and convincing evidence that the treatment of appellant's mental illness using ECT is necessary and reasonable.

This appeal follows.

## DECISION

In reviewing an order authorizing medical treatment, we must affirm the district court's findings if there is reasonable evidence to support them. *See In re Peterson*, 446 N.W.2d 669, 672 (Minn. App. 1989), *rev. denied* (Minn. Dec. 1, 1989). We will not reweigh the evidence and will not conclude that a fact-finder has clearly erred unless we are left with a definite and firm conviction that a mistake has been made. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021).

Minnesota law authorizes the head of a treatment facility to petition the district court for an order authorizing the prescribed treatment if a patient is incompetent to give consent or refuses consent. *See* Minn. Stat. § 253B.03, subd. 6(b)(3) (2022). The court must then determine the "necessity and reasonableness of the prescribed treatment." *Price*, 239 N.W.2d at 913. The district court must balance the patient's need for treatment against the intrusiveness of the prescribed treatment. *Id.* In doing so, the Minnesota Supreme Court has articulated six factors that district courts should consider:

7

> (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Id.*; *see also* Minn. R. 9515.0600 (2021) (enumerating list of factors for determining whether ECT is medically indicated). The treatment must also be "*presently* medically necessary." *In re Kinzer*, 375 N.W.2d 526, 532 (Minn. App. 1985) (emphasis in original) (speculating about future necessity does not satisfy *Price* because it improperly delegates the authority to medical personnel to evaluate the need for treatment and allows for intrusive therapy to be imposed without notice to the patient or the patient's attorney).

## I.     The district court properly balanced the *Price* factors.

Appellant argues that ECT is not "presently medically necessary." Appellant relies on the statutory language that provides the procedures to be used "to obtain consent for any treatment necessary to preserve the life or health of any committed patient." Minn. Stat. § 253B.03, subd. 6(b) (2022). Appellant then cites to a dictionary definition to assert that "necessary" means "absolutely needed or required."

Appellant's argument largely overlooks the framework established by the supreme court in *Price* for determining whether a treatment is necessary and reasonable. Appellant, instead, pursues a novel analysis that focuses on whether a treatment is "absolutely needed or required to preserve" the life or health of the patient. But the *Price* factors subsume the medical-necessity element that appellant wishes to have this court analyze separately.

8

In *Price*, the Minnesota Supreme Court adopted six factors that district courts should consider in determining the "necessity and reasonableness of the prescribed treatment." 239 N.W.2d at 913. These factors have been consistently relied upon to determine the necessity and reasonableness of treatment, both for ECT and neuroleptic medications. *See, e.g.*, *Jarvis v. Levine*, 418 N.W.2d 139, 144 (Minn. 1988) (noting that *Price* "enunciated the criteria to be utilized by the probate courts in determining the necessity and reasonableness of the proposed treatment").[2] Those factors inherently address the question that appellant wants separately analyzed: is the treatment medically necessary?

We decline to extend *Price* to include appellant's novel argument that would add an independent analysis of medical necessity apart from the six factors articulated by the supreme court. The function of this court is "limited to identifying errors and correcting them." *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988); *see Binkley v. Allina Health Sys.*, 877 N.W.2d 547, 554 n.7 (Minn. 2016) (noting that it is not a court's place to contemplate policy considerations entrusted to the legislature). As such, we turn to the district court's analysis of the *Price* factors and review whether the court's findings are supported by clear and convincing evidence.

---

[2] *See also In re J.S.G.*, No. C2-96-1522, 1996 WL 722113, at *2 (Minn. App. Dec. 17, 1996); *In re Bublitz*, No. CX-97-1570, 1998 WL 2419, at *4 (Minn. App. Jan. 6, 1998); *In re Witthans*, No. CX-94-1280, 1994 WL 523778, at *2 (Minn. App. Sept. 27, 1994); *In re Cade*, No. C5-97-1024, 1997 WL 666089, at *2 (Minn. App. Oct. 28, 1997); *In re Civ. Commitment of Glem*, A04-1908, 2005 WL 626913, at *4 (Minn. App. Mar. 15, 2005); *In re Civ. Commitment of Tefera*, No. A10-1770, 2011 WL 781353, at *2 (Minn. App. Mar. 8, 2011). We cite these, and other, nonprecedential cases in this opinion for their persuasive value. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

**II.** **The district court properly considered and balanced the *Price* factors.**

Appellant argues the district court's analysis of the *Price* factors is not supported by clear and convincing evidence and challenges the district court's balancing of those factors. We address each argument in turn.

    **A.** **The district court's consideration of the *Price* factors is supported by clear and convincing evidence.**

        1.     *Extent and duration of changes effected by the treatment*

The district court found that the treatments proposed "are the least intrusive treatment option" for "improving [appellant's] condition." The administration of ECT "may decrease [appellant's] delusional beliefs and psychotic behaviors, while making [appellant] more comfortable and more able to participate in other forms of treatment." Without ECT, the district court found "[appellant's] condition will likely remain the same and may even deteriorate." The court found that the mental-health professionals are "at the end of the road in terms of what to offer" appellant. The district court determined that, "[a]lthough exact efficacy is uncertain, ECT will likely improve [appellant's] mental status which may improve her likelihood of getting an order to leave the hospital."

These findings are supported by clear and convincing evidence because the second examiner opined that, although slightly less than 50% of patients see improvement, "[t]he efficacy of ECT is well established" and "can be expected to result in a stabilization of mood as well as a potential decrease in psychotic symptoms." While elimination or significant reduction in delusional beliefs is the preferred goal, "decrease in emotional instability and distress is acceptable and can result in an increased quality of life even in

10

the absence of significant reduction in the definitive target symptoms." The examiner concluded that, despite over ten years of treatment, appellant "is still severely symptomatic and mentally ill, and . . . [w]ithout this combination of aggressive treatment, there appears to be no realistic hope that [appellant] can ever be safely released to the community."

### 2. *Risks of adverse side effects*

The district court acknowledged that ECT may result in side effects such as headaches, muscle aches, drowsiness, confusion, and short-term memory loss. Although uncommon, the court noted that "potentially serious side effects include, but are not limited to, the risk associated with receiving general anesthesia, prolonged memory loss, or bone fractures." The district court also noted that ECT is performed "under close monitoring by medical professionals," and that the other serious side effects are "very uncommon."

These findings are supported by clear and convincing evidence in the record. The second examiner explained how the use of anesthesia has minimized the risks associated with ECT. She noted that cognitive impairment is "usually limited and of short duration, . . . memory impairment tends to disappear several months after cessation of treatment," and that "[p]rolonged or severe cognitive impairment, primarily memory loss, is extremely rare." Ultimately, the examiner concluded that "ECT is considered one of the best tolerated biological therapies with low risk for severe complications."

### 3. *Experimental nature of the treatment*

The district court found that the use of ECT "is not an experimental form of treatment," and that it "has been utilized for many years to treat mental health disorders." This finding is supported by clear and convincing evidence, as demonstrated by the second

11

examiner's clear statement that ECT "is not experimental" and has been utilized for many years "for treatment of mood disorders and for other serious psychiatric illnesses."

4.    *Acceptance by the medical community*

The district court found that ECT is accepted in the general psychiatric community in Minnesota and most other states. This is supported by clear and convincing evidence in the record as the second examiner testified that ECT "is accepted in the general psychiatric community both in Minnesota and in most states. It is in widespread use in many hospitals in the area and is accepted as a highly effective and safe treatment for serious psychiatric symptomology."

5.    *Extent of intrusion into the patient's body and pain*

The district court found that ECT "involves minimal pain connected with the treatment," because patients "are under general anesthesia while the ECT is given." This finding is also supported by clear and convincing evidence in the record as the second examiner testified that the insertion of an intravenous line into the arm and monitoring procedures are "painless." Additionally, the examiner noted that the seizure caused by ECT "is so subtle that it typically must be monitored" on an electroencephalogram. Overall, the examiner concluded that "there is minimal actual pain" because the patient is asleep during the procedure, and post-procedure discomfort is generally "mild and brief."

6.    *Patient's ability to competently determine whether the treatment is desirable*

The district court found that, at the time of the hearing, appellant "lacked the capacity to determine whether the proposed treatment was necessary or desirable and

12

lacked the competency to consent to said treatment." Additionally, the court found that appellant "lacks insight into her mental illness and therefore cannot rationally weigh risks and benefits involved with such treatment."

These findings are supported by clear and convincing evidence because the second examiner opined that appellant "is not able to engage in rational discussion regarding the risks versus benefits of ECT," and she has "no insight into her mental illness." The first examiner shared this opinion, stating that appellant "did not have an awareness of her situation," and "was not able to demonstrate an understanding of the treatment with ECT nor express a clear choice that was not based on delusional thoughts."

## B.     The district court properly balanced the *Price* factors.

Ultimately, the district court considered the *Price* factors and found, by clear and convincing evidence, that ECT is necessary, reasonable, and in appellant's best interests. The district court's findings support the conclusion that ECT is presently medically necessary because, from a medical standpoint, "ECT is virtually the only option that can be hoped to provide at least a moderate degree of improvement."[3]

As the district court did, we also recognize that appellant's circumstances are unique compared to other cases involving ECT because appellant is "functioning well" in her

---

[3] In a nonprecedential case, we affirmed a district court's order finding ECT treatment was reasonable and necessary, and in doing so we acknowledged that while both doctors agreed the appellant in that case was "stable and not in immediate danger," they also agreed that all pharmacological treatment options had been exhausted, and the appellant would likely remain depressed and delusional without ECT treatment. *Tefera*, 2011 WL 781353, at *3. We find that holding persuasive and follow its reasoning given the very comparable opinion provided in the second examiner's report in this case. *Id.*

13

current setting, there is no medical emergency, appellant's behavior patterns and mental activity have "been stable for many years," and appellant is not aggressive or catatonic. However, our review is limited to whether the district court's findings, based on the factors established in *Price*, are supported by clear and convincing evidence. *See Sefkow*, 427 N.W.2d at 210 (noting the function of the court of appeals is limited to identifying and correcting errors). Since the district court's findings relevant to each of the *Price* factors are supported by clear and convincing evidence, and because those findings support the district court's decision regarding ECT, we affirm.

**Affirmed.**